UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROCCO FARELLA, ROBERT R. REIMERTZ, JR.,
HAROLD FRAY, DESIREE LYONS, JOSEPH                        **<u>COMPLAINT</u>**
CAIVANO, VINCENT BALSAMO, FERNANDO
CAMACHO and GEORGE RODRIGUEZ,
                                                          Docket No. 05 CIV. 5711

                                    Plaintiffs,

                - against -                                Hon. Naomi Reice Buchwald


CITY OF NEW YORK,

                                    Defendant.
------------------------------------------------------------------X


Dated: June 20, 2005
         Orangeburg, New York              Respectfully submitted by:


                                           ***KEVIN T. MULHEARN, P.C.***

                                           Attorneys for Plaintiffs

                                           60 Dutch Hill Road
                                           Suite 8
                                           Orangeburg, New York 10962
                                           Phone: 845-398-0361
                                           Fax: 845-398-3836

## INDEX

|  | PAGES |
|---|---|
| **INDEX OF EXHIBITS** | **iii** |
| **OVERVIEW** | **1-2** |
| **JURISDICTION AND VENUE** | **2-3** |
| **PARTIES** | **3-5** |
| **FACTS** | **6-36** |
| **COMMON ALLEGATIONS** | **6-36** |
| **RELEVANT DOCUMENTS AND REPORTS RELATED TO LEAD EXPOSURE AT 24TH PRECINCT** | **6-22** |
| **PRE-ACTION DISCLOSURE ISSUES** | **22-24** |
| **APPLICABLE FEDERAL REGULATIONS** | **24-28** |
| **DUTIES OWED TO PLAINTIFFS BY CITY OF NEW YORK** | **28-31** |
| **GROSSLY NEGLIGENT AND/OR RECKLESS ACTS OR OMISSIONS OF CITY OF NEW YORK** | **31-37** |
| **AS AND FOR A FIRST CLAIM - DEPRIVATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS TO BE FREE FROM CONDUCT BY GOVERNMENTAL EMPLOYER THAT "SHOCKS THE CONSCIENCE", IN VIOLATION OF 42 U.S.C. § 1983** | **37-41** |
| **AS AND FOR A SECOND CLAIM - DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS OF FULL ACCESS TO COURTS AND PROPERTY INTEREST IN FULL VALUE OF A LAWSUIT, IN VIOLATION OF 42 U.S.C. § 1983** | **41-44** |
| **AS AND FOR A THIRD CLAIM - NEGLIGENCE (WITH RESPECT TO ROCCO FARELLA)** | **44-45** |
| **AS AND FOR A FOURTH CLAIM - NEGLIGENCE (WITH RESPECT TO ROBERT R. REIMERTZ, JR.)** | **45-47** |

**<u>PAGES</u>**

**AS AND FOR A FIFTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO HAROLD FRAY)**                              **47-48**

**AS AND FOR A SIXTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO DESIREE LYONS)**                            **49-50**

**AS AND FOR A SEVENTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO JOSEPH CAIVANO)**                           **50-52**

**AS AND FOR AN EIGHTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO VINCENT BALSAMO)**                          **52-53**

**AS AND FOR A NINTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO FERNANDO CAMACHO)**                         **53-55**

**AS AND FOR A TENTH CLAIM - NEGLIGENCE**
**(WITH RESPECT TO GEORGE RODRIGUEZ)**                         **55-56**

**AS AND FOR AN ELEVENTH CLAIM - SPOLIATION OF**
**EVIDENCE WHICH HAS IMPAIRED AND CONTINUES TO IMPAIR**
**PLAINTIFFS' RIGHTS TO SUE THIRD-PARTY TORTFEASORS**          **57-60**

**AS AND FOR A TWELFTH CLAIM - FRAUDULENT CONCEALMENT**        **60-62**

**AS AND FOR A THIRTEENTH CLAIM - VIOLATION**
**OF NEW YORK GENERAL BUSINESS LAW § 349**                     **62-63**

**ADDITIONAL ALLEGATIONS PERTAINING**
**TO TIMELINESS OF PLAINTIFFS' CLAIMS**                        **63-65**

**AD DAMNUM CLAUSE**                                           **65-68**

**JURY TRIAL DEMAND**                                          **68**

## INDEX OF EXHIBITS

**Exhibit A:**     "Lead Exposure at New York City Police Department Firing Ranges", a report dated January, 1992, conducted by the Mayor's Office of Operations, the Citywide Office of Safety and Health  and the New York City Department of Health.

**Exhibit B:**      "Investigative Narrative", dated February 6, 1996 (date of investigation: November 19, 1995), executed by Wayne Murray.

**Exhibit C:**     Report of Micro Ecologies, Inc., an independent laboratory, dated November 27, 1995.

**Exhibit D:**     Memorandum of NYPD Captain, Kevin F. Barry, dated November 30, 1995, to Commanding Officer, Patrol Borough Manhattan North, regarding "High Levels of Lead Contamination within the 24th Precinct".

**Exhibit E:**     Letter from John V. Pareso, President of B.P. & J Associates, Inc., to Perry Lopez of Thacker Engineering, dated December 19, 1995.

**Exhibit F:**     Memorandum of NYPD Chief of Personnel, Michael A. Markman, dated April 4, 1996, to Commanding Officer, Administrative Services Division and Commanding Officer, Firearms and Tactics Section, regarding "Lead Contamination in Areas Adjacent to the Indoor Firing Range at the 24th Precinct".

**Exhibit G:**     Memoranda of NYPD Chief of Personnel, Michael A. Markman, dated May 3, 1996, to various police officers, regarding "Results of Personal Lead Exposure Monitoring".

**Exhibit H:**     Memorandum of NYPD Chief of Personnel, Michael A. Markman, dated May 10, 1996 (with attachments), to Commanding Officer, Firearms and Tactics Section, regarding "Lead Exposure Monitoring and Ventilation Survey at 24th Precinct Firing Range, 151 W. 100th Street, Manhattan".

**Exhibit I:**     Letter of Perry Lopez, Thacker Engineering, Inc., dated May 9, 1996, to Department of General Services, regarding "Rifle Range Ventilation System".

**Exhibit J:**     Letter of John V. Pareso, President of B.P. & J. Associates, Inc., dated May 6, 1996, to Perry Lopez, regarding "24th Police Precinct".

**Exhibit K:**   Memorandum from NYPD Captain Joseph R. Riley, Commanding Officer, Building Maintenance Section, dated May 15, 1996, regarding "Lead Contamination in Areas Adjacent to the Indoor Firing Range at the 24th Precinct", with endorsements.

**Exhibit L:**   Report from Amir Rasheed, Director, NYPD-OSH Unit, dated January 6, 2004 to Deputy Commissioner, Office of Labor Relations, regarding "Health Hazard Assessment at 24th Precinct".

**Exhibit M:**   Report of Department of Health and Mental Hygiene, Environmental and Occupational Disease Epidemiology Offices regarding "Activities Related to Investigations at New York City Police Department (NYPD Precinct 24) and Fire Department of New York City (FDNY) Engine 76, located at 151 West 100th Street", dated April 8, 2004.

**Exhibit N:**   Report of Forensic Associates, Inc., dated September 25, 2004.

**Exhibit O:**   Report of Dennis M. Stainken, Ph.D., DABFE, CMI, Princeton - Somerset Group, Inc., dated March 22, 2004 (prepared for NYC Patrolmen's Benevolent Association), entitled "Evaluation of Indoor Air Quality: February 4, 2004".

**Exhibit P:**   Plaintiffs' Pre-Action Disclosure Petition Order to Show Cause, signed by Hon. Paul G. Feinman , and Plaintiffs' Demand for Production of Documents, dated January 31, 2005.

**Exhibit Q:**   Letter of Christopher J. Murdoch, Esq., City of New York Law Department, to Kevin T. Mulhearn, Esq., dated May 17, 2005.

**Exhibit R:**   Letter of  Kevin T. Mulhearn, Esq., counsel for Plaintiffs,  to Christopher J. Murdoch, dated May 26, 2005.

**Exhibit S:**   Letter of Christopher J. Murdoch, Esq., City of New York Law Department, to Kevin T. Mulhearn, Esq., dated May 26, 2005.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
ROCCO FARELLA, ROBERT R. REIMERTZ, JR.,
HAROLD FRAY, DESIREE LYONS, JOSEPH                           **COMPLAINT**
CAIVANO, VINCENT BALSAMO, FERNANDO
CAMACHO and GEORGE RODRIGUEZ,
                                                            Docket No. 05 CIV. 5711
                                    Plaintiffs,

                - against -                                  Hon. Naomi Reice Buchwald


CITY OF NEW YORK,

                                    Defendant.
--------------------------------------------------------------------X

      Plaintiffs, ROCCO FARELLA, ROBERT R. REIMERTZ, JR., HAROLD FRAY,
DESIREE LYONS, JOSEPH CAIVANO, VINCENT BALSAMO, FERNANDO CAMACHO
and GEORGE RODRIGUEZ, complaining of the Defendant, CITY OF NEW YORK, by and
through their attorneys, Kevin T. Mulhearn, P.C., hereby allege that:


### OVERVIEW

      1.     Each of the Plaintiffs in this action is a retired or active New York City Police
Officer or active New York City Firefighter who seeks compensation for serious injuries as a
result of his or her prolonged exposure to extraordinarily high levels of lead and other toxic
substances at 151 W. 100th Street, New York, New York, the building which houses both the
NYPD's 24th Precinct Stationhouse and the FDNY's Engine 76, Ladder 22, Firehouse.  The
principal source of exposure to said toxic substances was the firing range located in the basement
of said building, which, according to the CITY OF NEW YORK's own internal reports, had a
defective or malfunctioning ventilation system.  Said exposures to extremely high levels of lead
occurred for well over a decade, until 2004, despite that Defendant, CITY OF NEW YORK, had
actual knowledge of the extremely high levels of lead and the corresponding severe risk of harm
to CITY OF NEW YORK employees at the subject premises, from as early as January, 1992.

2.      This action, which includes federal claims as well as pendent state claims, alleges that Defendant, CITY OF NEW YORK, was grossly negligent and/or reckless in that it exposed its employees to extremely high levels of toxic substances with actual knowledge of the catastrophic health impact on certain of its employees that was substantially certain to occur, failed to warn or notify its employees about said exposure, and failed to conduct the required medical monitoring which would have identified and minimized its employees' adverse health effects.  Plaintiffs claim that Defendant's aggregate conduct,  in which it violated numerous statutes, regulations and well-settled standards of care, should "shock the conscience" of contemporary society, particularly because all of its acts or inactions were made after due deliberation and with actual knowledge of  the potential consequences thereof.

3.      Additionally, an important allegation featured in both the federal and pendent claims is that Defendant, CITY OF NEW YORK, negligently, recklessly or intentionally spoliated key evidence to such an extent as to substantially impair Plaintiffs' rights to proceed in this action against both Defendant, CITY OF NEW YORK, and other third party tortfeasors. Plaintiffs allege that Defendant, CITY OF NEW YORK's, wanton disregard of its statutorily mandated obligation to take, maintain and preserve relevant employee exposure records and measurements has deprived Plaintiffs of full access to the courts and the full value of their claims.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction of this action pursuant to, **inter alia**, **28 U.S.C. § 1343**, **42 U.S.C. § 1983** and the **Due Process Clause of the Fourteenth Amendment of the United States Constitution**, as Plaintiffs' first and second claims allege that Defendant, CITY OF NEW YORK, deprived them of their federally protected rights to be free from conduct by a governmental employer that "shocks the conscience" and their rights of full access to courts and property interest in full value of a lawsuit, respectively.  As such, this action presents one or more federal questions.

2

5.      This Court has supplemental jurisdiction, pursuant to **28 U.S.C. § 1367**, over all pendent claims pleaded in this action, as all pendent claims pleaded herein are so related to the aforesaid federal claims in this action that they are part of the same "case or controversy" within the meaning of **Article 3 of the United States Constitution**.

6.      Venue is proper in this judicial district, pursuant to **28 U.S.C. §§ 1391 (b)(1) and (c)(1)**, as Defendant, CITY OF NEW YORK, is a municipal corporation which resides, and at all material times has resided, within this judicial district, and at all material times has been subject to personal jurisdiction within this judicial district.  Moreover, the facts and events which comprise Plaintiffs' claims occurred and arose within this judicial district.

## **PARTIES**

7.      Plaintiff, ROCCO FARELLA ("FARELLA"), is a retired New York City Police Department officer.  He was employed by the New York City Police Department ("NYPD"), an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately January, 1986 to February, 2003.  FARELLA resides in the County of Westchester, State of New York.

8.      Plaintiff, ROBERT R. REIMERTZ, JR. ("REIMERTZ"), is a retired New York City Police Department officer.  He was employed by the New York City Police Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately January, 1984 to April, 1996.   REIMERTZ resides in the County of Suffolk, State of New York.

9.      Plaintiff, HAROLD FRAY ("FRAY"), is a retired New York City Police Department officer.  He was employed by the New York City Police Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately November, 1979 to September, 2000.   FRAY resides in the County of Orange, State of New York.

3

10.     Plaintiff, DESIREE LYONS ("LYONS"), is a New York City Police Department officer.  She has been employed by the New York City Police Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately1992 to present.  LYONS resides in the County of Rockland, State of New York.

11.     Plaintiff, JOSEPH CAIVANO ("CAIVANO"), is a New York City Police Department officer.  He has been employed by the New York City Police Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately February, 1994   to present.  CAIVANO resides in the County of Rockland, State of New York.

12.     Plaintiff, VINCENT BALSAMO ("BALSAMO"), is a New York City Police Department officer.  He has been employed by the New York City Police Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately July, 1986 to present.  BALSAMO resides in the County of Orange, State of New York.

13.     Plaintiff, FERNANDO CAMACHO ("CAMACHO"), is a New York Fire Department officer.  He has been employed by the New York City Fire Department ("FDNY"), an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately February, 1999 to present.  CAMACHO resides in the County of Westchester, State of New York.

14.     Plaintiff, GEORGE RODRIGUEZ ("RODRIGUEZ"), is a New York City Fire Department officer.  He has been employed by the New York City Fire Department, an administrative agency and department of Defendant, CITY OF NEW YORK, from approximately October, 1996  to present.  RODRIGUEZ resides in the County of Dutchess, State of New York.

15.     Defendant, CITY OF NEW YORK, is a City Charter form of government, with the structure and function of its governmental powers set forth in its Charter, a municipal corporation, and a municipal political subdivision of the State of New York.  Defendant's authorized agent for legal process is the City of New York Law Department, 100 Church Street, New York, New York 10007.

16.     Defendant, CITY OF NEW YORK, employed, or employs, each of the Plaintiffs in this action.

17.     At all material times, Defendant, CITY OF NEW YORK, has owned and controlled the real property located at 145-151 W. 100th Street, New York, New York 10025 (the "subject premises").  The subject premises, at all material times, is the building which housed and continues to house both the 24th Precinct stationhouse for the New York City Police Department ("NYPD") and the firehouse for Engine 76, Ladder 22 of the Fire Department of the City of New York ("FDNY").

18.     Upon information and belief, there exists one (1) or more persons or entities who are likewise liable to each of the Plaintiffs in this action.  Upon information and belief, however, these persons or entities are either unknown to Plaintiffs at this time and will continue to remain unknown and unidentifiable to Plaintiffs due exclusively to Defendant, CITY OF NEW YORK's, negligent, reckless and/or intentional spoliation, destruction, discarding or loss of numerous documents, records and other evidence which the Defendant, CITY OF NEW YORK, was duty-bound by law to preserve; or, alternatively these persons or entities are known to Plaintiffs, but Plaintiffs may not assert any cause of action against these persons or entities because the essential facts needed to state a viable cause of action against these persons or entities have been obfuscated, hidden or destroyed by Defendant, CITY OF NEW YORK, due exclusively to Defendant, CITY OF NEW YORK's, negligent, reckless and/or intentional spoliation, destruction, discarding or loss of numerous documents, records and other evidence which Defendant, CITY OF NEW YORK, was duty-bound by law to preserve.

5

## FACTS

## COMMON ALLEGATIONS

**RELEVANT DOCUMENTS AND REPORTS**
**RELATED  TO LEAD EXPOSURE AT THE 24TH PRECINCT**

19.     Plaintiffs have obtained numerous reports and documents, pursuant to their pre-action disclosure petition against the Defendant, CITY OF NEW YORK, and otherwise, which contain myriad facts relevant to the Complaint.  Throughout this Complaint, Plaintiffs will endeavor to provide specific citations of the source(s) of said facts whenever practicable.

20.     The reports and/or documents which are cited herein, incorporated herein by reference, and annexed hereto as Exhibits are as follows:

Exhibit A: "Lead Exposure at New York City Police Department Firing Ranges", dated January, 1992 (hereinafter "***COSH/DOH 1992 Report***"), conducted by the Mayor's Office of Operations, the Citywide Office of Safety and Health ("COSH") and the New York City Department of Health ("DOH"):

Exhibit B: "Investigative Narrative", dated February 6, 1996 (date of investigation: November 19, 1995), executed by Wayne Murray (hereinafter "***1996 Investigative Narrative***.");

Exhibit C: Report of Micro Ecologies, Inc., an independent laboratory, dated November 27, 1995 (hereinafter "***Micro Ecologies Report***");

Exhibit D: Memorandum of NYPD Captain, Kevin F. Barry, dated November 30, 1995, to Commanding Officer, Patrol Borough Manhattan North, regarding "High Levels of Lead Contamination within the 24th Precinct" (hereinafter "***Barry Memorandum***");

6

Exhibit E: Letter from John V. Pareso, President of B.P. & J Associates, Inc., to Perry Lopez of Thacker Engineering, dated December 19, 1995 (hereinafter "***Pareso 12/19/95 Letter***");

Exhibit F: Memorandum of NYPD Chief of Personnel, Michael A. Markman, dated April 4, 1996, to Commanding Officer, Administrative Services Division and Commanding Officer, Firearms and Tactics Section, regarding "Lead Contamination in Areas Adjacent to the Indoor Firing Range at the 24th Precinct" (hereinafter "***Markman 4/4/96 Memorandum***");

Exhibit G: Memoranda of NYPD Chief of Personnel, Michael A. Markman, dated May 3, 1996, to various police officers, regarding "Results of Personal Lead Exposure Monitoring" (hereinafter "***Markman 5/3/96 Memoranda***");

Exhibit H: Memorandum of NYPD Chief of Personnel, Michael A. Markman, dated May 10, 1996 (with attachments), to Commanding Officer, Firearms and Tactics Section, regarding "Lead Exposure Monitoring and Ventilation Survey at 24th Precinct Firing Range, 151 W. 100th Street, Manhattan (hereafter "***Markman 5/10/96 Memorandum***");

Exhibit I: Letter of Perry Lopez, Thacker Engineering, Inc., dated May 9, 1996, to Department of General Services, regarding "Rifle Range Ventilation System" (hereinafter "***Lopez 5/9/96 Letter***");

Exhibit J: Letter of John V. Pareso, President of B.P. & J. Associates, Inc., dated May 6, 1996 to Perry Lopez, regarding "24th Police Precinct" (hereinafter "***Pareso 5/6/96 Letter***");

Exhibit K: Memorandum from NYPD Captain Joseph R. Riley, Commanding Officer, Building Maintenance Section, dated May 15, 1996, regarding "Lead Contamination in

Areas Adjacent to the Indoor Firing Range at the 24th Precinct", with endorsements (hereinafter
"***Riley 5/15/96 Memorandum***");

Exhibit L: Report from Amir Rasheed, Director, NYPD-OSH Unit, dated January
6, 2004 to Deputy Commissioner, Office of Labor Relations, regarding "Health Hazard
Assessment at 24th Precinct" (hereinafter "***Rasheed 1/6/04 Report***");

Exhibit M: Report of Department of Health and Mental Hygiene, Environmental
and Occupational Disease Epidemiology Offices regarding "Activities Related to Investigations
at New York City Police Department (NYPD Precinct 24) and Fire Department of New York
City (FDNY) Engine 76, located at 151 West 100th Street", dated April 8, 2004 (hereinafter
"***DOH 4/8/04 Report***");

Exhibit N: Report of Forensic Associates, Inc., dated September 25, 2004
(hereinafter "***Forensics Associates Report***"); and

Exhibit O: Report of Dennis M. Stainken, Ph.D., DABFE, CMI, Princeton -
Somerset Group, Inc., dated March 22, 2004 (prepared for NYC Patrolmen's Benevolent
Association), entitled "Evaluation of Indoor Air Quality: February 4, 2004" (hereinafter
"***Princeton - Somerset Group Report***").

21.     The 24th Precinct building at 151 West 100th Street was built in the 1960s.
(***Princeton-Somerset Group Report*** (Ex. O) at p. 1).

22.     Beginning in autumn 1989, the Mayor's Office of Operations and Citywide
Office of Safety and Health (COSH) conducted a comprehensive industrial hygiene assessment
of 11 indoor and 1 outdoor NYPD firing ranges.  Likewise, the New York City Department of
Health (DOH) conducted a health assessment for lead exposure of NYPD firing range personnel.
 "Results showed that [then] current conditions at both the indoor and outdoor ranges constituted
a risk for lead exposure."  (***COSH/DOH 1992 Report*** (Ex. A) at p. iii).

23.     "The NYPD was alerted to the problem of lead exposure among officers assigned to its Firearms and Tactics Unit during the mid 1970's, when blood lead screening was conducted under a joint venture between the Mount Sinai School of Medicine and the PD."  (***COSH/DOH 1992 Report*** (Ex. A) at p. 8).

24.     "Blood lead screening results of personnel in the PD Firearms and Tactics Unit from 1984 to [1992] which were available to the NYC Department of Health . . . indicate[d] that a significant portion [of said personnel] consistently experience[d] elevated levels."  (***COSH/DOH 1992 Report*** (Ex. A) at p. 8).

25.     At the indoor ranges, several of the ventilation systems, particularly the one at the 24th Precinct, had "design flaws."  Many had lynotex curtains which impeded air flow and most showed signs of inadequate maintenance.  (***COSH/DOH 1992 Report*** (Ex. A) at p. iii).

26.     "Lead exposure in firing ranges is a recognized health hazard."  (***COSH/DOH 1992 Report*** (Ex. A) at p. 1).

27.     "Lead dust and fumes on firing ranges are produced by the combination of conventional lead-containing combustion primers, the heating and shearing of the lead slug from friction as it travels down the barrel, and the impact of the slug as it hits the bullet traps."  (***COSH/DOH 1992*** Report (Ex. A) at p.1).

28.     Lead exposure and cases of lead poisoning among law enforcement personnel in the United States have been documented since the early 1950s.  "Lead, which is an odorless metal, may enter the body through inhalation of fumes or dust and ingestion of dust, and is rapidly transferred to the bones and soft tissue."  (***COSH/DOH 1992 Report*** (Ex. A) at pp. 1-2).

29.     "The health effects of lead are well established.  Toxic effects of lead include: a) interference with the synthesis of hemoglobin, b) damage to the central and peripheral nervous systems, c) damage to the kidney, and d) adverse reproductive effects including damage to

sperm, miscarriages, menstrual disorder and birth defects. . . [as well as] high blood pressure."
At elevated blood lead levels, the signs and symptoms of severe lead intoxication include loss of
appetite, constipation, nausea, pallor, excessive tiredness, weakness, insomnia, headache,
nervous irritability, muscle and joint pains, tremors, numbness, dizziness and colic."
(***COSH/DOH 1992 Report*** (Ex. A) at pp. 2-3).

30.     In 1978, the Federal Occupational Safety and Health Administration (OSHA)
promulgated a comprehensive Lead Standard, **29 CFR 1910.1025**.  This standard was adopted
by the New York State Department of Labor Public Employee Safety and Health (PESH)
Bureau.  The applicable Lead Standard contains detailed provisions, including: an exposure limit
for airborne lead, lead control methods, housekeeping, respiratory protection, medical
surveillance and removal protection.  (***COSH/DOH 1992 Report*** (Ex. A) at p. 3).

31.     To determine which provisions apply, the standard requires, **inter alia**, that in
workplaces where lead is present, the employer must determine the amount of lead to which
workers are exposed by regularly conducting air monitoring.  Air lead levels are measured in
micrograms per cubic meter of air (mcg/M3).  (***COSH/DOH 1992 Report*** (Ex. A) at p. 3).

32.     COSH conducted an investigation of the design and operating efficiency of the
mechanical ventilation system at each NYPD indoor range.  Air velocity was measured and air
movement patterns were observed throughout each range.  In addition, wipes samples of high-
contact surfaces were taken to determine existing lead contamination and evaluate housekeeping
practices.  (***COSH/DOH 1992 Report*** (Ex. A) at pp. 9-10).

33.     "All indoor ranges had dedicated mechanical ventilation systems consisting of
outdoor air intakes, motor/fan units, and duct work to supply outdoor air and remove
contaminated air.  The number, configuration, and operating performance of inner range
ventilation components varied significantly among ranges." (***COSH/DOH 1992 Report*** (Ex. A)
at p. 11).

34.     "The effectiveness of each system in removing lead dust and fumes is dependent upon both its design and operating efficiency."  Ventilation systems in four ranges, including the 24th Precinct, performed poorly, "due to inappropriate design features." (***COSH/DOH 1992 Report*** (Ex. A) at p. 11, emphasis added).

35.     Notably, at the 24th Precinct range, "the absence of supply air behind shooters, and the poorly placed, side wall mounted single exhaust intake resulted in extremely low air velocities (< 25 f.p.m.) at the firing line." (***COSH/DOH 1992 Report*** (Ex. A) at p. 13).

36.     Accordingly, the 24th Precinct range was assigned by COSH a Level 1 Ventilation System Performance Rating.  Level 1 was defined as follows: "System configuration and/or air flow velocities are not conducive to control of lead hazard below the OSHA action level of 30 mcg/M3; immediate ventilation remediation necessary in order to control and minimize lead exposures at the firing line." (***COSH/DOH 1992 Report*** (Ex. A) at p. 12, emphasis added).

37.     Moreover, most indoor range ventilation equipment was in need of maintenance. Fan housings, ductwork, and metal grills covering supply diffusers and exhaust intakes were frequently laden with soot. (***COSH/DOH 1992 Report*** (Ex. A) at p. 13).

38.     "The results of the industrial hygiene and health assessments indicate[d] that the [then] current conditions at both the indoor and outdoor ranges constituted a risk for lead exposure." (***COSH/DOH 1992 Report*** (Ex. A) at p. 29).

39.     "Ventilation systems in the indoor ranges need[ed] to have an ongoing maintenance program to monitor their condition and performance." (***COSH/DOH 1992 Report*** (Ex. A) at p. 31).

40.     "Immediate modifications [were] necessary in the ventilation systems for Headquarters, and 24 and 69 Precinct firing ranges.  Both the design and function of the systems

11

were ineffective in controlling airborne lead exposures, as indicated by both the ventilation survey and the personal air monitoring data." (***COSH/DOH 1992 Report*** (Ex. A) at p. 31, emphasis added).

41.     "When ventilation is used to control exposure . . . measurements which demonstrate the effectiveness of the system, must be made at least every 3 months and checked within 5 days of any process, production or control changes.  This is especially important in light of the ventilation inadequacies that were documented at some indoor ranges." (***COSH/DOH 1992 Report*** (Ex. A) at p. 34; emphasis added).  (This requirement is specifically mandated by the federal Lead Standard at **29 CFR 1910.1025(e)(4)(i)**).

42.     Likewise, **29 CFR 1910.1025(e)(4)(ii)** provides: Recirculation of air.  If air from exhaust ventilation is recirculated into the workplace, the employer shall assure that (A) the system has a high efficiency filter with reliable back-up filter; and (B) controls to monitor the concentration of lead in the return air and to bypass the recirculation system automatically if it fails are installed, operating, and maintained.

43.     "Ventilation equipment at the indoor ranges must also be routinely inspected and cleaned.  "The NYPD was advised to must establish an inspection, maintenance and cleaning schedule for all indoor range ventilation equipment." (***COSH/DOH 1992 Report*** (Ex. A) at p. 36).

44.     All of the indoor ranges needed to be equipped with HEPA vacuums.  The vacuums needed to be used in all areas of the range. (***COSH/DOH 1992 Report*** (Ex. A) at p. 36).

45.     COSH and DOH made the following statement: "The firing ranges at Headquarters and the 24 Precinct should not be re-opened for use until ventilation modifications, which reduce exposures to shooters, can be implemented . . . once changes in the ventilation have been implemented, personal exposure monitoring should be performed for shooters in order to evaluate the effectiveness of the system.  In addition, there should be a regular maintenance

plan for the ventilation systems at all indoor ranges." (**COSH/DOH 1992 Report** (Ex. A) at p. 39, emphasis added).

46.     Upon information and belief, in or about July, 1994, B.P. & J. Associates, Inc., Mechanical Contractors, entered into a contract with the Defendant, CITY OF NEW YORK, to, **inter alia**, modify the ventilation system at the basement firing range of the 24th Precinct.  B.P. & J. Associates, Inc. is a corporation which is duly incorporated in the State of New York, at all material times has conducted business regularly within the State of New York, and whose principal place of business is, and at all material times has been, 44 Lieper Street, Huntington Station, New York 11746.

47.     Upon information and belief, Thacker Engineering was the General contractor chosen by the CITY OF NEW YORK for this project.  Thacker Engineering is a corporation which is duly incorporated within the State of New York, at all material times has conducted business regularly within the State of New York, and whose principal place of business is, and at all material times has been, 120 Duane Street, Suite 400, New York, New York 10007.

48.     Upon information and belief, on or about August 15, 1995, B. P. & J. Associates, Inc. submitted a requested change order authorization for the necessary labor and material to install a proper operating system as per its new control sequence and control diagram dated August 15, 1995.  Said Sub-Contract Change Order Authorization form states that the reason for the change was "Design Error."

49.     In October, 1995, the 24th Precinct Club hired an independent laboratory, Micro Ecologies, Inc., to conduct tests for possible asbestos contamination within the confines of the 24th Precinct.  (**Barry Memorandum** (Ex. D) at p. 1).

50.     On November 27, 1995, Micro Ecologies, Inc. produced a Report (Micro Ecologies, 1995 Report) which memorialized its indoor environmental evaluation of the 24th Precinct which was performed on October 18, 1995.

13

51.     Said 1995 Report included an evaluation of lead containing particulate contamination.  The lab report of several wipe samples taken at the 24th Precinct indicated "<u>very high levels of lead contamination</u>." (Micro Ecologies 1995 Report at p. 1).  As a result, a wipe sample was taken from atop a cabinet in the food/beverage storage room.  "Using the EPA approved Atomic Absorption Method, this sample was found to contain 116,720 ug/sq. ft. (Pb). The HUD standard for post-lead remediation testing [was] 200 ug/sq. ft."  (***Micro Ecologies 1995 Report*** (Ex. C) at p. 1, emphasis added).

52.     Micro Ecologies Inc. concluded that the "<u>lead level in your sample [was] therefore approximately 500 times higher than allowable</u>, suggesting the potential for <u>high level exposure</u> to this contaminant both through inhalation and ingestion.  We strongly recommend clinical testing for persons exposed to this contamination to determine blood and/or bone levels of lead." (***Micro Ecologies 1995 Report*** (Ex. C) at p. 1, emphasis added).

53.     Said 1995 Report from Micro Ecologies was delivered to Kevin F. Barry, NYPD, then Captain of the 24th Precinct, on or about November 27, 1995.  (***Barry Memorandum*** (Ex. D) at p. 1).

54.     On November 30, 1995, Captain Barry forwarded a Memorandum, dated November 30, 1995, to Commanding Officer, Patrol Borough Manhattan North (Ex. D).  The "subject" line of this Memorandum reads:

> **"High Levels of Lead Contamination within the 24th Precinct.**
> **Request all Personnel be tested for Lead Exposure."**

55.     Said Barry Memorandum provides in pertinent part that:

> [T]he lab technician found that a part of the basement contains extremely high levels of lead.  Tests conducted in Room C-2 proved to have a lead content 580 times greater than acceptable levels.  Room C-2 runs adjacent to the indoor range and was found to have exposed air ducts leading from the range.  This room was being utilized by the 24th Precinct Club to store soda and juice for the vending machines located on the first floor.

On September 27, 1995 (sic), [Captain Barry] received a communication from Micro Ecologies, Inc. indicating the above results.  The communication **strongly advised** that clinical testing be conducted for any person possibly exposed to this contamination to determine blood and/or bone levels of lead.  Since **anyone who has purchased soda or juice from the vending machines may have been exposed**, it is the request of [Captain Barry] that Health Services Division assign personnel to come to the 24th Precinct and test any employee of both the 24th Precinct and Patrol Borough Manhattan North who wants to be tested.

On September 30, 1995 (sic), Lieutenant Joseph Santiago, 24th Precinct Operations Coordinator, contacted Sergeant Schur of Health Services Division and apprised him of the situation.

(***Barry Memorandum*** (Ex. D) at p. 1; emphasis added).

56.     Within thirty (30) days of said Barry Memorandum, said Memorandum was endorsed by Nicholas Estavillo, NYPD Assistant Chief, Wilbur L. Chapman, NYPD Chief of Patrol, and Louis R. Anemone, NYPD Chief of Department, each of whom recommended that said Memorandum be forwarded to Commanding Officer, Medical Division.

57.     Upon information and belief, none of the Plaintiffs in this action, or any other employees of the 24th Precinct, were ever informed by the NYPD, FDNY or any other CITY OF NEW YORK agency, department, official or municipal policymaker, of their potential exposure to extremely high levels of lead through both traditional and non-traditional routes of exposures, and/or the availability of blood lead or bone lead testing to determine their then-existing levels of lead in their respective bodies.

58.     On December 19, 1995, John V. Pareso, President of B.P. & J. Associates, Inc., sent Perry Lopez of Thacker Engineering a letter (***Pareso 12/19/05 Letter*** (Ex. E)) in which he, **inter alia**, complained that "we still have not received a change order for the revised controls in the basement (see letter dated 8/18/95), nor for the changes in the ductwork in the lobby area (see letter dated 10/2/95)."  Mr. Pareso concluded this letter as follows: "How much longer are

we going to be delayed in completing our contract, which incidentally is now seventeen months old?"

59.     On or about May 6, 1996, John V. Pareso, President of B.P. & J. Associates, Inc., forwarded a letter to Perry Lopez of Thacker Engineering (***Pareso 5/6/96 Letter*** (Ex. J)), which reads as follows:

> The SF-2/EF-4 system serving the rifle range was activated on 4/26/96.  To accommodate the facility, the system was left in a running mode.  The warranty period has, therefore, started as of this date, and the maintenance of the system becomes the responsibility of N.Y.P.D.

60.     On or about May 9, 1996, Perry Lopez of Thacker Engineering forwarded a letter to Department of General Services (***Lopez 5/9/96 Letter*** (Ex. I)), which notified recipient of the contents of the May 6, 1996 Pareso letter, and asked for official sign-off for the unit.

61.     As a result of the November 27, 1995 Report of Micro Ecologies, Inc., Jeanine Phud'homme, Director of the NYPD-OSH Unit, Amir Rasheed, an industrial hygienist with the NYPD-OSH Unit, and a representative of NYPD Building Maintenance Section, subsequently conducted an inspection at the 24th Precinct.  (***Markman 4/4/96 Memorandum*** (Ex. F) at p. 1).

62.     According to the Memorandum of Michael A. Markman, NYPD Chief of Personnel, dated April 4, 1996 (Ex. F),

> The OSH Unit collected seven wipe samples in areas adjacent to the firing range. The analytical results . . . revealed that all seven wipe samples contain lead in the range of 510 to 57000 microgram per square foot (ug/ft. 2).  These levels exceed both the OSHA lead standard for housekeeping and Housing and Urban Development (HUD) guidelines for lead on surfaces.  HUD's criteria for lead dust on floor surfaces is 200 ug/ft. 2.

63.     In addition, the Markman April 4, 1996 Memorandum provided that:

During the inspection, <u>passive openings were observed which allow migration of lead/dust fumes from the firing range to the hallway and storage rooms</u> . . . [These passive] openings are located in Room #s C-3, C-4 and C-5.

(Emphasis added).

64.     Chief Markman further directed that the NYPD Building Maintenance Section seal the aforesaid passive openings immediately "to prevent further fume/dust migration", and that the louver section of the door leading to the back of the bullet trap be removed and replaced with material that would prevent passive air migration into the hallway.  (***Markman 4/4/96 Memorandum*** (Ex. F) at p. 1).

65.     The sample identification, results and locations, as memorialized in the April 4, 1996 Markman Memorandum (Ex. F), are as follows:

| Sample ID | LEAD RESULT (ug/ft2) | LOCATION |
| --- | --- | --- |
| AR-1 | 2600 | FLOOR IN THE HALLWAY, OPP RM # C-3 |
| AR-2 | 510 | FLOOR IN RM # C-5 |
| AR-3 | 7800 | EQUIPMENT IN HALLWAY |
| AR-4 | 15000 | TELEPHONE PANEL NEAR RM # C-5 |
| AR-5 | 5800 | SHELF IN RM # C-3 |
| AR-6 | 57000 | DOOR LOUVER RM # C-2 |
| AR-7 | 950 | FLOOR IN RM # C-3 |

17

66.     At minimum, as of April, 1996, Defendant, CITY OF NEW YORK had actual or constructive knowledge that its employees or former employees were being exposed, or may have been exposed, to extremely high levels of lead, lead dust and/or fumes, or other toxic or dangerous substances, at the subject premises, through potential exposure to said elements at the firing range in the 24th Precinct, and/or potential exposure from migration of said elements to other areas at the subject premises, and/or from potential exposure from inhalation of said elements, and/or from potential exposure from ingestion of food or beverages contaminated by said elements, and/or from potential exposure through the use of telephones at the subject premises.

67.     On April 10, 1996, the NYPD conducted limited air monitoring on several police officers who fired guns at the firing range to "determine airborne lead concentrations during test firing", as well as a "ventilation survey."  The NYPD's OSH Unit concluded, based solely on these limited tests, that the tested shooters and instructors were exposed to lead levels well below the OSHA Lead Standard's Action Level of 30 ug/m3 and TWA of 50 ug/m3, and that "the ventilation system and design, in general, appears to be adequate in maintaining airborne lead levels during shooting below regulated limits . . ." (See ***Markman 5/10/96 Memorandum*** (Ex. H) at pp. 2-3; ***Markman 5/3/96 Memoranda*** (Ex. G) at pp. 1-7).

68.     Upon information and belief, on or about May 15, 1996, the aforesaid passive openings in Rooms C-3, C-4 and C-5 were allegedly sealed by NYPD's Building Maintenance Section, and the louver section of the door leading back of the bullet trap was allegedly removed and replaced with a different material.  (***Riley 5/15/96 Memorandum*** (Ex. K)).

69.     On January 11, 2004, an article was published in the New York Post which stated that there had been an alarming outbreak of brain tumors, miscarriages and facial paralysis among men and women working in the 24th Precinct building.  "Cases cited included 20

18

miscarriages since 1986 among female police officers, three brain tumors since the mid 90s, two brain aneurisms in 1997, and six cases of Bell's Palsy facial paralysis [since 2002]." (***Princeton-Somerset Group Report*** (Ex. O) at p. 1).

70.     In January, 2004, in response to said New York Post article, the New York City Police Department, Occupational Safety and Health Unit, conducted an investigation as to potential health hazards at the 24th Precinct, and concluded that - as of January, 2004 - all lead samples showed lead concentrations below the established federal criteria.

71.     On February 25, 2004 the Department of Health and Mental Hygiene (DOHMH) conducted an initial inspection of the heating, ventilation and air conditioning (HVAC) system at the 24th Precinct. Remarkably, the ventilation system that handled the firing range in the building was <u>not</u> inspected, purportedly because said firing range "was no longer in use." (***DOH 4/8/04 Report*** (Ex. M) at p. 3).

72.     The April, 2004 Summary Report of this investigation indicated that: (1) the firehouse of Engine 76 shares the heating system with the neighboring NYPD 24th Precinct and (2) that the firing range had allegedly been closed for routine use in 1999, but was subsequently re-opened for periodic use in 2001.  (***DOH 4/8/04 Report*** (Ex. M) at p. 3).

73.     In February, 2004, the Princeton-Somerset Group, at the request of the NYPD PBA, conducted wipe sampling for lead and other metals at the subject premises.  Its Report concluded that: (1) three vent fans for the building ventilation were observed to be not plugged in and not operating; therefore,  part of the building ventilation system may have been malfunctioning; (2) various samples of dust and dirt at the subject premises contained levels of metals, such as lead, which exceeded several environmental soil cleanup and evaluation criteria set forth by USEPA and NJ Department of Environmental Protection; (3) the values found for lead on top of the lockers, and staircase, exceeded some criteria values established by HUD,

19

EPA and CDC for household floor dust, and indicated  a potential for exposure to lead and metals in these dusts; (4) the metallic dusts in the building and lockers needed to be cleaned; (5) the building ventilation needed to be checked to determine why one of the roof exhaust fans was off, and whether air recirculation in the building was adequate in the rooms on each floor; and (6) the air duct system and HVAC system and filters were visibly dirty, and some filters clogged with dust and dirt.  (***Princeton-Somerset Group Report*** (Ex. O) at pp. 4-10).

74.     At the request of counsel for Plaintiffs, in September, 2004, Forensics Associates conducted a preliminary analysis of the potential health impact of the deficient air quality at the 24th Precinct station house.  Forensics Associates reviewed a number of the aforesaid documents which emanated from the New York City Police Department and delivered to Plaintiffs' counsel a Report, dated September 25, 2004 (Ex. N):

75.     "Workers and shooters in many firing ranges have so much lead in their bodies that they are slowly being poisoned.  Lead can damage the brain, blood, nerves, kidneys and reproductive organs.  This damage can cause serious disability: memory loss, extreme tiredness, emotional problems, even kidney failure, coma or death." (***Forensics Associates Report*** (Ex. N) at pp. 6-7).

76.     "Lead can collect on clothes during the day. . . and [w]orkers can inadvertently carry hazardous materials home from work on their clothes, skin, hair, tools and in their vehicles." (***Forensic Associates Report*** (Ex. N) at p. 8).

77.     "Exposure to lead has been indicated to cause a wide range of neurological and developmental disorders: many of these ailments are consistent with health problems displayed by the police officers from the 24th Precinct." (***Forensics Associates Report*** (Ex. N) at p. 8).

78.     "[T]he exposures of officers to lead contamination in the 1990s have resulted in numerous reports of health problems.  These reported health problems include neurological disorders [and] cancer. . . Due to the lead dust and particle levels [as set forth in the 1992 Report and 1995 Report] the above effects may have contributed to health problems of the officers from the 24th Precinct." (***Forensics Associates Report*** (Ex. N) at p. 8).

79.     "The design of the ventilation system is important in reducing lead contamination in buildings with indoor firing ranges. Improper use or maintenance of ventilation systems can defeat its purpose and increase lead contamination. Effective ventilation system produces eddies and recirculation that can carry fumes and dust from weapons to the area behind the firing lines." (***Forensics Associates Report*** (Ex. N) at p. 6).

## PRE-ACTION DISCLOSURE ISSUES

80.     On or about January 31, 2004, Plaintiffs filed a pre-action petition for discovery against the CITY OF NEW YORK in the Supreme Court of the State of New York, County of New York (Index No. 05/101305).  The matter was assigned to the Honorable Paul G. Feinman.

81.     Said Petition and its accompanying Demand for Production of Documents, dated January 31, 2005 (annexed hereto as Exhibit P, along with Order to Show Cause signed by Judge Feinman), demanded that the CITY OF NEW YORK produce:

(1)  "[a]ll documents, including any contracts, invoices, receipts, drawings, photographs, charts, plans, studies, graphs, reports, memoranda, correspondence, or other documents, pertaining to or which relate to the selection of and/or work performed by any employee or agent of the CITY OF NEW YORK,  contractor, subcontractor, HVAC firm or specialist, architectural firm or specialist, engineering firm or specialist, independent contractor, or any other person, with respect to the design and/or installation of any ventilation system used for the indoor firing range located in the basement of the NYPD's 24th Precinct.";

(2) "[a]ll documents pertaining to or which relate to any modifications made to or maintenance or repairs concerning any ventilation system used for the firing range at the NYPD's 24th Precinct, including but not limited to any contracts, invoices, receipts, charts, plans, studies, graphs, drawings, photographs, memoranda, correspondence, reports or other documents, which detail or relate to any work performed by any employee or agent of the City of New York, contractor, subcontractor, HVAC firm or specialist, architectural firm or specialist, engineering firm or specialist, independent contractor, or any other person,  to modify, repair, maintain, improve or enhance any  ventilation system used for the firing range at the NYPD's 24th Precinct, from January, 1992 to present."; and

(3) "[a]ll documents, including any reports, memoranda, correspondence, graphs, charts, plans, studies, drawings, photographs, or other documents, which set forth, discuss or relate to any tests and/or measurements of airborne lead levels and/or exposure[s] at 145-151 W. 100th Street, New York, New York, and/or the effectiveness of any firing range ventilation system at the NYPD's 24th Precinct station house, which were conducted, directed, supervised or obtained by the City of New York and/or its departments, agencies, officials, agents or employees, from September, 1989 to present, including but not limited to the actual test results or measurement results as referred to herein."

82.     On May 17, 2005, Christopher J. Murdoch, Senior Counsel of the City of New York Law Department, 100 Church Street, New York, NY 10007, forwarded to Plaintiffs' counsel, Kevin T.  Mulhearn, a number of documents responsive to Plaintiffs' pre-action demand for documents.  (See Christopher J. Murdoch May 17, 2005 letter to Kevin T. Mulhearn, annexed hereto as Exhibit Q).

83.     In response, Kevin T. Mulhearn, counsel for Plaintiffs, by letter to Christopher J. Murdoch dated May 26, 2005 (Exhibit R, hereto), asked Mr. Murdoch to clarify whether Plaintiffs had received all documents in the CITY OF NEW YORK's custody, control or possession, which are responsive to Plaintiffs' aforesaid document request.

84.     By letter dated May 26, 2005 (Exhibit S, hereto), Christopher J. Murdoch replied to Kevin T. Mulhearn's May 26, 2005 letter in pertinent part as follows:

> Based on numerous communications with personnel who directed and oversaw searches, who personally conducted searches, and who were assigned to the pertinent sections/units at the time documents were generated, I can represent that all responsive documents in the City's custody, possession, or control have been located and produced.

85.     Plaintiffs' aforesaid pre-action disclosure petition against CITY OF NEW YORK was, therefore, withdrawn on or about June 1, 2005.

**APPLICABLE FEDERAL REGULATIONS**

86.     The federal lead standard which applies to all occupational exposure to lead, which became effective on March 1, 1979, is codified at **29 CFR § 1910.1025**.

87.     **29 CFR 1910.1025 (d) (4) (i)** provides that "[w]here a determination conducted . . . shows the possibility of any employee exposure at or above the action level, the employer shall conduct monitoring which is representative of the exposure for each employee in the workplace who is exposed to lead."

88.     **29 CFR 1910.1025 (d) (7)** provides:

> Additional monitoring.  Whenever there has been a production, process, control or personnel change which may result in new or additional exposure to lead, **or whenever the employer has any other reason to suspect a change which may result in new or additional exposure to lead**, additional monitoring in accordance with this paragraph shall be conducted.

(Emphasis added).

89.     **29 CFR 1910.1025 (e) (4)** ("Mechanical Ventilation") provides:

> (i)     When ventilation is used to control exposure, measurements which demonstrate the effectiveness of the system in controlling exposure, such as capture velocity, duct velocity, or static pressure shall be made at least every 3 months.  Measurements of the system's effectiveness in

23

controlling exposure shall be made within 5 days of any change in production, process or control which might result in a change in employee exposure to lead.

(ii)    Recirculation of air.  If air from exhaust ventilation is recirculated into the workplace, the employer shall assure that (A) the systems has a high efficiency filter with reliable back-up filter; and (B) controls to monitor the concentration of lead in the return air and to bypass the recirculation system automatically if it fails are installed, operating and maintained.

90.    **29 CFR 1910.1025 (m) (2) (i)** provides that "[t]he employer shall post the following warning signs in each work area where the PEL (permissible exposure level) is exceeded: WARNING - LEAD WORK AREA - POISON - NO SMOKING OR EATING."

91.    **29 CFR 1910.1025 (n) (1)** provides in pertinent part that the employer shall establish and maintain an accurate record of all monitoring required in **29 CFR 1910.1025 (d)**, which record shall include, **inter alia**, the date(s), number, duration, location and results of each of the samples taken, including a description of the sampling procedure used to determine representative employee exposure where applicable.

92.    **29 CFR 1025 (n) (4) (ii)** provides in pertinent part:

Environmental monitoring, medical removal, and medical records required by this paragraph shall be provided upon request to employees, designated representatives, and the Assistant Secretary in accordance with 29 CFR 1910.1020 (a) - (e) and (2) - (i).

93.    The federal standard which governs "Access to employee exposure and medical records" is codified at **29 CFR 1910.1020.**

94.    **29 CFR 1910.1020 (b) (2)** provides that "[t]his section applies to all employee exposure and medical records, and analyses thereof, of such employees, whether or not the records are mandated by specific occupational safety and health standards."

95.    **29 CFR 1910.1020 (b) (3)** provides in pertinent part that "[t]his section applies to all employee exposure records and analyses thereof, made or maintained in any manner . . . Each

24

employer shall assure that the preservation and access requirements of this section are complied with regardless of the manner in which the records are made or maintained."

96.     **29 CFR 1910.1020 (a)** provides in pertinent part that "[t]he purpose of this section is to provide employers and their designated representatives a right of access to relevant exposure and medical records" . . . and that "[e]ach employer is responsible for assuring compliance with this section."

97.     **29 CFR 1910.1020 (c) (4)** provides in pertinent part:

"Employee" means a current employee, a former employee, or an employee being assigned or transferred to work where there will be exposure to toxic substances or harmful physical agents.

98.     **29 CFR 1910.1020 (e) (i)** provides in pertinent part that an exposure record relevant to [an] employee consists of "[a] record which measures or monitors the amount of toxic substances or harmful physical agents to which the employee is or has been exposed."

99.     **29 CFR 1910.1020 (c) (5)** provides:

"Employee exposure record" means a record containing any of the following kinds of information:

(i) Environmental (workplace) monitoring or measuring of a toxic substance or harmful physical agent, including personal, area, grab, wipe or other form of sampling, as well as related collection and analytical methodologies, calculations and other background data relevant to interpretation of the results obtained;

(ii) Biological monitoring results which directly assess the absorption of a toxic substance or harmful physical agent by body systems (e.g., the level of a chemical in the blood, urine, breath, hair, fingernails, etc. but not including results which assess the biological effect of a substance or agent or which access an employee's use of alcohol or drugs;

(iii) Material safety data sheets indicating that the material may pose a hazard to human health; or

(iv)  In the absence of the above, a chemical inventory or any other record which reveals where and when used the identity (e.g., chemical, common or trade name) of a toxic substance or harmful physical agent.

100.   **29 CFR 1910.1020 (d) (1)** provides in pertinent part:

Unless a specific or occupational safety and health standard provides a different period of time, each employer shall assure the preservation and retention of records as follows:

"Employee exposure records."  Each employee exposure record shall be preserved and maintained for at least thirty (30) years, except that

(A)   Background data to environmental (workplace) monitoring or measuring, such as laboratory reports and worksheets, need only be retained for one (1) year so long as the sampling results, the collection methodology (sampling plan), a description of the analytical and mathematical methods used, and a summary of other background data relevant to interpretation of the results obtained, are retained for at least thirty (30) years . . .

101.   The New York State Plan for Public Employee Occupational Safety and Health received initial OSHA approval on June 1, 1984.  The plan designated the New York State Department of Labor as the State agency responsible for administering the plan throughout the state.  The New York State Plan included legislation, the **New York Public Employees Safety and Health Act (PESHA), Chapter 729 of the Laws of 1980**, enacted in 1980, and amended on April 30, 1984, to clarify the State's right of entry for inspection authority.

102.   The New York plan provided for the adoption of all Federal OSHA standards promulgated as of July 31, 1983.

103.   In the implementing regulations to PESHA, New York State adopted all federal safety standards, including but not limited to **29 CFR 1910.1025** and **29 CFR 1910.1020**, pursuant to **12 NYCRR § 800.3**.

104.   **29 CFR 1956.50 Subpart F** specifically codifies federal rules for New York State's Plan for public employers.

26

105.    **29 CFR 1956.50 (h)**, which governs "Records and reports" states that "[t]he plan provides that public employers in New York will maintain appropriate records and make timely reports on occupational injuries and illnesses in a manner substantially identical to that required for private sector employers under Federal OSHA."

106.    Thus, a public employer within New York state must maintain records with respect to employee exposures to toxic substances in a substantially identical manner as that required for private employers under Federal OSHA.

## DUTIES OWED TO PLAINTIFFS BY CITY OF NEW YORK

107.    Defendant, CITY OF NEW YORK, owed each of the Plaintiffs herein a duty to provide him or her with a safe and healthy place of employment.

108.    Defendant, CITY OF NEW YORK, owed each of the Plaintiffs herein a duty to provide him or her with a place of employment free from dangerous amounts of lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

109.    Defendant, CITY OF NEW YORK, at all material times, had actual or constructive knowledge that its firing range located in the basement was a potential source of dangerous exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

110.    Defendant, CITY OF NEW YORK, at all material times, had a duty to make sure that said firing range ventilation system was designed, installed and maintained in an efficient and safe manner, in order to protect Plaintiffs and other employees of the CITY OF NEW YORK from undue exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

111.    Defendant, CITY OF NEW YORK, at all material times, had a duty to make sure that its firing range ventilation system had an ongoing maintenance program to monitor its condition and performance, and to prevent Plaintiffs and other employees of the CITY OF NEW

YORK from undue exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

112.    Defendant, CITY OF NEW YORK, at all material times, had actual or constructive knowledge that the ventilation system for the firing range in the basement of the 24th Precinct stationhouse was used to control exposure to lead, lead dust and/or fumes and/or other toxic or dangerous substances.

113.    Defendant, CITY OF NEW YORK, at all material times, pursuant to **29 CFR 1910.1025 (e) (4) (i)** and **29 CFR 1910.1020 (d) (2) (ii)**, had a duty to take, preserve and maintain (for at least thirty (30) years) measurements which would demonstrate the effectiveness of the ventilation system, not less than once every three (3) months and checked within five (5) days of any process, production or control changes to said system.

114.    Defendant, CITY OF NEW YORK, at all material times, had actual or constructive knowledge that air from the exhaust ventilation in the firing range at the 24th Precinct was recirculated into the workplace at the subject premises regularly.

115.    Defendant, CITY OF NEW YORK, at all material times, pursuant to **29 CFR 1910.1025 (e) (4) (ii) (A)**, had a duty to assure that the ventilation system for the firing range for the 24th Precinct had a high efficiency filter with a reliable back-up filter.

116.    Defendant, CITY OF NEW YORK, at all materials times, pursuant at **29 CFR 1910.1025 (e) (4) (ii) (B)**, had a duty to assure that controls to monitor the concentration of lead in return air recirculated into the workplace from said ventilation system, and to bypass the recirculation system automatically if said filter fails, were installed, operating and maintained.

117.    Defendant, CITY OF NEW YORK, at all material times, had a duty to establish an inspection, maintenance and cleaning schedule for its ventilation equipment for the 24th Precinct firing range.

118.    At minimum, as of January, 1992, Defendant,  CITY OF NEW YORK, had actual or constructive knowledge that the ventilation system for the 24th Precinct firing range was performing poorly "due to inappropriate design feature."

119.    At minimum, as of January, 1992, Defendant, CITY OF NEW YORK, had actual or constructive knowledge that the system configuration and/or air flow velocities with respect to the ventilation system for the 24th Precinct's firing range was "not conducive to control of lead hazard below the OSHA action level 30 mcg/M3."  At all material times, therefore, Defendant, CITY OF NEW YORK, had a duty to conduct appropriate and representative monitoring for its employees who had possibly been exposed to lead at or above the action level.

120.    At minimum, as of January, 1992, Defendant,  CITY OF NEW YORK,  had actual or constructive knowledge that, to control and minimize exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, it was necessary for the CITY OF NEW YORK to shut down the firing range at the 24th Precinct until appropriate ventilation modifications were implemented and tested to make sure that the modified ventilation system protected Plaintiffs and other employees of the CITY OF NEW YORK from undue exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

121.    Indeed, at all material times - and particularly from January, 1992, Defendant, CITY OF NEW YORK had a duty to make, or cause to be made, all appropriate modifications to the ventilation system for the firing range at the 24th Precinct in a safe, expeditious and effective manner.

122.    At all material times, Defendant, CITY OF NEW YORK, had actual or constructive knowledge that the presence of toxic and/or dangerous substances at the 24th Precinct Stationhouse were causing (or had the potential to cause) rampant and serious illnesses to numerous individuals employed by the CITY OF NEW YORK.

123.    At all material times, Defendant, CITY OF NEW YORK, had a duty to warn and notify all employees who worked at 151 W. 100th Street, New York, New York, that they were at risk from exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, through potential inhalation and/or ingestion of lead, lead dust and/or fumes, and/or other toxic or dangerous substances.

124.    Beginning at minimum in January, 1992, Defendant, CITY OF NEW YORK, had a duty to notify all employees employed at 151 W. 100th Street, New York, New York, including each of the Plaintiffs herein, that they should be tested for potential lead exposure, through blood lead testing, bone lead testing or other appropriate medical monitoring or surveillance.

125.    At all material times, Defendant, CITY OF NEW YORK, had a duty to take all appropriate remediation and other corrective measures to minimize its employees' exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, at the premises located at 151 W. 100th Street, New York, New York.

126.    At all material times, Defendant, CITY OF NEW YORK, had a duty to institute and conduct an education and training program for all employees routinely exposed to toxic substances, such as each of the Plaintiffs herein, which would educate and train said employees, **inter alia**, as to (1) the location of toxic substances to which the employees may be exposed, (2) the properties of toxic substances to which employees may be exposed, (3) the acute and chronic effects of exposure at hazardous levels, (4) the symptoms of effects of exposure at hazardous levels, (5) proper conditions for safe use and exposure to such toxic substances, and (6) procedures for the cleanup of such toxic substances.

**GROSSLY NEGLIGENT AND/OR RECKLESS**

30

**ACTS OR OMISSIONS OF CITY OF NEW YORK**

127.    At all material times, Defendant, CITY OF NEW YORK, was reckless, careless and grossly negligent, and deliberately indifferent to the lives and safety of its employees, including each of the Plaintiffs, in that it knew of the harm being caused, or potentially being caused, to Plaintiffs and others employed at 151 W. 100th Street, New York, New York, but nonetheless:

(A)    continuously failed to conduct and/or preserve proper and comprehensive tests, measurements and monitoring with respect to the air quality, and or ventilation system efficiency at the subject premises, and/or the health or medical impact or consequences on the CITY OF NEW YORK's employees as a result thereof;

(B)    continuously failed to consult with appropriate and/or sufficiently qualified environmental experts, toxicologists and/or epidemiologists, in order to identify clearly and remediate determine the source(s) and extent of the toxic or dangerous substances at the subject premises and to minimize the health impact, physical injuries or consequences of its employees' exposure to said toxic or dangerous substances;

(C)    continuously failed to evacuate the subject premises and utilize other facilities, until the source(s) of toxicity at the subject premises was remediated;

(D)    continuously failed to shut down the firing range at the 24th Precinct, until - at minimum - all toxic and/or dangerous substances were removed from the subject premises, the ventilation system at said firing range was repaired and/or modified to reduce its employees' exposure to toxic and/or dangerous substances to a safe level, and all employees were warned and notified as to said potential dangers, tested and, if necessary, treated for any personal injuries or consequences caused by said exposure;

(E)    continuously failed to warn and/or notify all employees working at the 24th Precinct, including each of the Plaintiffs herein, of the risks of harm,

and/or the dangerously high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances at the subject premises;

(F)     continuously failed to provide its employees, including each of the Plaintiffs herein, with appropriate and necessary medical monitoring and/or surveillance in order to treat its employees, including each of the Plaintiffs herein, to determine whether they had been exposed to any toxic or dangerous substances and to minimize any physical injuries or consequences from said exposure;

(G)     continuously failed to make its employees, including each of the Plaintiffs, aware of its findings with respect to the existence of extremely high levels of lead at the subject premises for a number of years;

(H)     continuously failed to take the necessary, appropriate and recommended safeguards to prevent undue exposure to lead, lead dust and/or fumes, or other toxic and/or dangerous substances, such as providing adequate design, installation, repair and/or maintenance of the ventilation system(s) in the basement of the subject premises and otherwise;

(I)     continuously failed to implement and enforce necessary and corrective measures, instructions and/or policies or procedures for persons utilizing said firing range to reduce or eliminate the release and/or migration to non-range areas of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, all of which resulted in persons at the aforesaid premises, particularly each of the Plaintiffs herein, being exposed to unacceptable and excessive levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances;

(J)     violated **New York Labor Law § 200**, by, **inter alia**, failing to provide its employees, including each of the Plaintiffs herein, a place of employment "so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places";

32

(K)     violated **New York Labor Law § 27-a**, by, **inter alia**, failing to "(1) furnish to each of its employees, employment and a place of employment which [was] free from recognized hazards that [were] causing or likely to cause death or serious physical harm to its employees and which [would] provide reasonable and adequate protection to the lives, safety or health of its employees; and (2) comply with the safety and health standards promulgated under [said] section";

(L)     violated **New York Labor Law § 876** (the **New York State "Right-to-Know" Law**) by, **inter alia**, failing to provide its employees, including each of the Plaintiffs herein, with appropriate notice and information regarding the aforesaid toxic substances at the workplace, including but not limited to notice of (1) the location of toxic substances to which the employees may be exposed, (2) the properties of toxic substances to which employees may be exposed, (3) the acute and chronic effects of exposure at hazardous levels, (4) the symptoms of effects of exposure at hazardous levels, (5) proper conditions for safe use and exposure to such toxic substances, and (6) procedures for the cleanup of such toxic substances;

(M)     violated **New York Labor Law § 878**, by, **inter alia**, failing to provide its employees, including each of the Plaintiffs herein and each of the Plaintiffs' immediate supervisors, with the requisite education and training program for employees routinely exposed to toxic substances;

(N)     violated **29 CFR 1910.1025(e)(4)(i)**, which has been specifically adopted by New York State, by failing to take and/or preserve tests or measurements which would demonstrate the effectiveness of the ventilation system at the 24th Precinct firing range at least once every three (3) months and checked within five (5) days of any process, production or control changes";

(O)     violated **29 CFR 1910.1025(e)(4)(ii)**, which has been specifically adopted by New York State, by failing to assure that the ventilation system at the 24th Precinct firing range had a high efficiency filter with a reliable back-

33

up filter and that controls to monitor the concentration of lead in the return air and to bypass the recirculation system automatically if said ventilation system failed were installed, operating and maintained;

(P)    **violated  29 CFR 1910.1025(m)(2)(i)**, which has been specifically adopted by New York State, by failing to post appropriate warning signs in work areas where its employees were exposed to toxic substances, and, in fact, permitted beverages and food to be consumed by its employees in areas where extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances were present;

(Q)    **violated 29 CFR 1910.1025(n)(1)**, which has been specifically adopted by New York State, by failing to take, establish, maintain and/or preserve accurate records of all monitoring required by **29 CFR 1910.1025(d)**, which records should have included, **inter alia**, the date(s), number, duration, location and results of each of the samples taken, as well as a description of the sampling procedure used to determine representative employee exposure;

(R)    violated  **29 CFR 1910.1025(d)(4)(i)**, which has been specifically adopted by New York State, by failing to conduct the appropriate monitoring which was representative of the exposure for each employee in the workplace who was possibly exposed to lead;

(S)    violated **29 CFR 1910.1025(d)(7)**, which has been specifically adopted by New York State, by failing to conduct additional monitoring in accordance with **29 CFR 1910.1025(d)**, despite having knowledge and information as to the occurrence of a change or changes which were likely to have resulted in new or additional exposure to lead;

(T)    violated **29 CFR 1910.1020(a)-(e)**, which has been specifically adopted by New York State, pursuant to **29 CFR 1956.50(h)** and otherwise, by failing to maintain or preserve all required employee exposure records and measurements for the subject premises and for employees who worked in the subject premises, for the required time period (thirty [30] years);

34

(U)     violated the **New York City Administrative Code §27-127**, by failing to maintain the building of the 24th Precinct station house and all parts thereof and equipment therein in a safe condition and in good working order;

(V)     violated the **New York City Administrative Code §27-128**, by failing to maintain safely the building located at 151 W. 100th Street, New York, New York and its facilities therein;

(W)     violated the **New York City Building Code, Subchapter 12, §27-66**, by, **inter alia**, failing to prevent and/or consider sufficiently the danger of large concentrations of toxic substances in the air and the danger of large concentrations of airborne irritants, such as dust, that may be injurious to health, with respect to its design and installation of the ventilation system for the firing range at the 24th Precinct;

(X)     violated numerous other sections of the **New York City Administrative Code**, **New York City Building Code**, **New York City Industrial Code** and other applicable codes, rules and regulations;

(Y)     demonstrated deliberate, intentional and criminal indifference to the health and safety of its employees, including each of the Plaintiffs herein, because Defendant, CITY OF NEW YORK, and it agents, officials, agencies, departments and municipal policymakers knew, to a substantial certainty, that the extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances at the subject premises, would cause particular employees who were exposed to said elements, such as each of the Plaintiffs herein, serious physical injuries, precisely such as the injuries suffered by each of the Plaintiffs herein, yet nonetheless failed to take the appropriate remediation measures, or warn its employees of the high risk of exposure, or compel its employees to be tested for such exposure in order to minimize the health impact or consequences of said exposure, and;

(Z)     demonstrated such perverse and obstinate failure to discharge its aforesaid duties towards its employees, including each of the Plaintiffs herein, as to warrant a presumption of a reckless indifference to the rights of its employees, such as each of the Plaintiffs herein, which is equivalent to intentional misconduct; and said reckless indifference and intentional misconduct was authorized, ratified or fostered by numerous persons in positions of authority and/or policymakers in the New York City Police Department, New York City Department of Health and other administrative agencies or departments of Defendant, CITY OF NEW YORK.

## AS AND FOR A FIRST CLAIM

### DEPRIVATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS TO BE FREE FROM CONDUCT BY GOVERNMENTAL EMPLOYER THAT "SHOCKS THE CONSCIENCE", IN VIOLATION OF 42 U.S.C. § 1983

128.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "127" herein, as if each has been fully set forth at length.

129.    **42 U.S.C. § 1983** provides in pertinent part:

Every person who, under any color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

130.    At all material times, Defendant, CITY OF NEW YORK, was, and is, a municipal corporation doing business in New York State, and a legal "person" within the meaning of **42 U.S.C. § 1983**.

131.    Likewise, each of the Plaintiffs is an "injured party" who has standing to assert his or her own **42 U.S.C. § 1983** claim.

36

132.     At all material times, Defendant, CITY OF NEW YORK, and its agents, officials, agencies, departments and municipal policymakers, acted with the authority of and under color of New York State law.

133.     At all material times, Defendant, CITY OF NEW YORK, and its agents, officials, agencies, departments and municipal policymakers, acted with knowledge of the applicable New York State laws and statutes with respect to Defendant, CITY OF NEW YORK's, continuing obligations to keep its employees free from unnecessary and excessive exposure to toxic substances and contaminants - and to preserve the necessary records to document its employees' exposure to any said toxic substances and contaminants.

134.     At all material times, Defendant, CITY OF NEW YORK's agents, officials, agencies, departments and/or municipal policymakers, acted with official character such as to lend the weight of New York State to their decisions involving the aforesaid toxic and/or hazardous conditions at the subject premises.

135.     At all material times, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, adopted a municipal custom, policy or practice to expose its employees at the subject premises, including each of the Plaintiffs herein, to excessive and dangerous levels of lead, lead dust and/or fumes and/or other toxic or dangerous substances, in contravention of its aforesaid statutory and regulatory duties to not do so, after due deliberation and despite its knowledge of  said  conditions and the catastrophic health consequences likely to result from said custom, policy or practice.

136.     At all material times, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, adopted a municipal custom, policy or practice to wrongfully and fraudulently conceal from its employees at the subject premises, including each of the Plaintiffs herein, the aforesaid facts and information with respect to said exposure to lead and other toxic substances, in contravention of its aforesaid statutory and regulatory duties to warn and notify said employees of said exposure, after due

deliberation and despite its knowledge of the catastrophic health consequences likely to result from said custom, policy or practice.

137.    At all material times, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, adopted a municipal custom, policy or practice to fail to provide each of its potentially exposed employees with the required medical testing, monitoring or surveillance, in contravention of its aforesaid statutory and regulatory duties to provide said medical testing, monitoring or surveillance, after due deliberation and despite its knowledge that said mandated medical testing, monitoring or surveillance would have permitted its employees, including each of the Plaintiffs herein, to identify, treat and minimize the health consequences of their exposure.

138.    At all material times, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, adopted a municipal custom, policy or practice to fail to take, maintain and preserve the mandated air quality tests, tests which measured the efficiency of the ventilation system at the firing range and other employee exposure records and measurements, in contravention of its aforesaid statutory and regulatory duties, after due deliberation and despite its knowledge of  said obligations and the likely draconian consequences of its failure to comply with said obligations.

139.    The **Due Process Clause of the Fourteenth Amendment of the United States Constitution**  provides in pertinent part that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  (**U.S. Const., Amdt. 14, § 1**).

140.    The aforesaid conduct of Defendant, CITY OF NEW YORK, violates each of Plaintiffs' substantive due process rights, as protected by said **Due Process Clause of the Fourteenth Amendment**, to be free from conduct by a governmental employer that "shocks the conscience" and "interferes with rights implicit in the concept of ordered liberty."

141.     Indeed, in every material instance, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, had ample opportunity to deliberate before embarking on the aforesaid challenged conduct, but in every material instance made a decision to knowingly, recklessly and wantonly jeopardize the health and safety of its employees, including each of the Plaintiffs, at the subject premises.   The aforesaid municipal policies, customs or practices constitute a "state created danger" in that Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, created the aforesaid dangerous environment in which each of Plaintiffs' injuries occurred.

142.     Upon information and belief, at all material times, one or more municipal officials with final policy making authority directly commanded each of the aforesaid municipal policies, customs or practices with respect to the subject premises and/or concerning Defendant, CITY OF NEW YORK's, employees.

143.     Upon information and belief, each of the aforesaid municipal policies, customs or practices with respect to the subject premises and/or concerning Defendant, CITY OF NEW YORK's, employees, was so pervasive, widespread and well-settled as to constitute an official policy, custom or usage of Defendant, CITY OF NEW YORK, with full force of law.  Moreover, Defendant, CITY OF NEW YORK, by and through its agents, officials, agencies, departments and municipal policymakers, upon information and belief, adopted a widespread municipal policy of condoning  the aforesaid municipal policies, practices or customs to such an extent that various CITY OF NEW YORK  agents, officials, agencies, departments and municipal policymakers knowingly and/or maliciously violated the federally protected rights (as alleged herein) of Plaintiffs, and other employees at the subject premises, because Defendant, CITY OF NEW YORK, led them to believe that they could do so with impunity and without legal sanction.

144.     Upon information and belief, the aforesaid municipal policies, customs or practices of Defendant, CITY OF NEW YORK, with respect to the subject premises and/or

concerning Defendant, CITY OF NEW YORK's, employees, each demonstrates Defendant, CITY OF NEW YORK's, deliberate indifference to the aforesaid rights and medical needs of Defendant, CITY OF NEW YORK's, employees, including each of the Plaintiffs, at the subject premises.   Said deliberate and wanton indifference to said rights and medical needs, upon information and belief,  was approved, ratified and/or authorized by one or more municipal policymaker(s) of Defendant, CITY OF NEW YORK.

145.    As a direct and proximate result of Defendant, CITY OF NEW YORK's, deprivation of their aforesaid constitutional rights, in violation of **42 U.S.C. § 1983**, each of the Plaintiffs has suffered injuries as described in detail hereinbelow.

## AS AND FOR A SECOND CLAIM

### DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS OF FULL ACCESS TO COURTS AND PROPERTY INTEREST IN FULL VALUE OF A LAWSUIT, IN VIOLATION OF 42 U.S.C. § 1983

146.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "145" herein, as if each has been fully set forth at length.

147.    Defendant, CITY OF NEW YORK's, aforesaid failure to take, preserve and maintain the air quality tests, tests which measured the efficiency of the ventilation system at the subject firing range and other employee exposure records and measurements, as statutorily mandated, substantially and materially impairs Plaintiffs' abilities to try their within claims sounding in violation of **42 U.S.C. § 1983**, negligence, spoliation of evidence which impairs Plaintiffs' rights to sue third party tortfeasors, fraudulent concealment and violation of **New York General Business Law § 349**, in that none of these claims may be tried with all material evidence.

148.    Indeed, Defendant, CITY OF NEW YORK's, negligent, reckless or intentional spoliation of said material evidence, deprives Plaintiffs of vital evidence with respect to each Plaintiff's precise amount of exposure to lead, lead dust and/or fumes, and/or other toxic or

dangerous substances, at various relevant times.   This key issue: ***the precise amount of each Plaintiff's exposure to toxic substances***, has been rendered substantially unresolvable due exclusively to Defendant, CITY OF NEW YORK's, aforesaid spoliation of evidence. Defendant, CITY OF NEW YORK, indeed, by reason solely of its own bad faith or gross negligence has severely limited, if not destroyed, Plaintiffs' abilities to prove the requisite element of "proximate cause" for each of the claims in this case.

149.    Moreover, although plaintiffs may not generally sue a municipality for punitive damages, punitive damages may be available against individual officials and/or agents of a municipality who demonstrate such a perverse and obstinate failure to discharge their duties toward a municipality's employees so as to warrant a presumption of reckless indifference which is the legal equivalent to intentional misconduct.

150.    Punitive damages may properly be awarded against municipal agents or officials, such as those in this case, to punish said individuals for gross misconduct or dereliction of duty and deter others from similar behavior, particularly when, as in this case, said individuals acted with reckless or callous indifference to the federally protected rights and safety of others.

151.    However, due to the aforesaid negligent, reckless and/or intentional spoliation of the aforesaid key evidence by Defendant, CITY OF NEW YORK, Plaintiffs are forever foreclosed from suing, or even identifying,  any number of  persons or entities against whom they have viable claims for punitive damages and/or compensatory damages.  (See Plaintiffs' Eleventh Claim, as alleged with particularity herein at ¶¶ "213"  to  "232", which is incorporated by reference in its entirety in this claim).

152.    Plaintiffs have thus been deprived by Defendant, CITY OF NEW YORK, of their constitutional right to full access to courts, which is grounded, **inter alia**, within the **Due Process Clause of the Fourteenth Amendment of the United States Constitution**, and/or the **Article IV Privileges and Immunities Clause of the United States Constitution**, and/or the **Petition Clause of the First Amendment of the United States Constitution**, and/or the **Due**

**Process Clause of the Fifth Amendment of the United States Constitution**, and/or the **Equal Protection Clause of the Fourteenth Amendment of the United States Constitution**.

153.    Moreover, the full value of a lawsuit is a property right protected by the **Due Process Clause of the Fourteenth Amendment of the United States Constitution**.

154.    Plaintiffs, therefore, have federally protected rights not to be deprived of their property interest in this within action without due process.

155.    Based on the aforesaid conduct of Defendant, CITY OF NEW YORK, particularly with respect to its gross spoliation of evidence, Defendant, CITY OF NEW YORK, has deprived each of the Plaintiffs, and continues to deprive each of the Plaintiffs, of his or her aforesaid constitutional rights to full access to courts and property rights in the full value of his or her lawsuit, in violation of **42 U.S.C. § 1983**.

156.    As a direct and proximate result of Defendant, CITY OF NEW YORK's, deprivation of their aforesaid constitutional rights, in violation of **42 U.S.C. § 1983**, each of the Plaintiffs has suffered injuries as described in detail hereinbelow, and Defendant, CITY OF NEW YORK, is obligated to indemnify each of the Plaintiffs for all damages he or she has incurred pursuant to each of the claims pleaded within this Complaint.

## AS AND FOR A THIRD CLAIM

## NEGLIGENCE (WITH RESPECT TO ROCCO FARELLA)

157.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "156" herein, as if each has been fully set forth at length.

158.    Plaintiff, ROCCO FARELLA, in his capacity as a police officer of the NYPD and an employee of the CITY OF NEW YORK, was exposed to extremely high levels of lead, lead

dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately January, 1987 to March 1996 and thereafter.

159.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duties of the CITY OF NEW YORK, and its agents, Plaintiff, ROCCO FARELLA, suffered multiple and serious injuries and pain and suffering, including but not limited to two (2) brain aneurysms, requiring two (2) operations, which resulted in pain, discomfort, emotional distress, migraine headaches, loss of smell, loss of taste and impairment of sexual functioning, all of which compelled Plaintiff, ROCCO FARELLA, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

160.    In other words, upon information and belief, Plaintiff, ROCCO FARELLA's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, ROCCO FARELLA, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, ROCCO FARELLA, was engaged in the performance of his assigned duties as a police officer or during any acts which were reasonably necessary or incidental to his employment.

161.    Plaintiff, ROCCO FARELLA, became aware of the proximate cause of his injuries on or about September 25, 2004, after receipt and review of  the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

162.    Plaintiff, ROCCO FARELLA, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

43

163.    Plaintiff, ROCCO FARELLA, pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on December 22, 2004, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A FOURTH CLAIM
## NEGLIGENCE (WITH RESPECT TO ROBERT R. REIMERTZ, JR.)

164.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "163" herein, as if each has been fully set forth at length.

165.    Plaintiff, ROBERT R. REIMERTZ, JR., in his capacity as a police officer of the NYPD and an employee of the CITY OF NEW YORK, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately January, 1985 to July, 1992 and thereafter.

166.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the CITY OF NEW YORK, and its agents, Plaintiff, ROBERT R. REIMERTZ, JR., suffered multiple and serious injuries and pain and suffering, including but not limited to a brain tumor (acoustic neuroma) which required surgery, which resulted in pain, discomfort, emotional distress, headaches, partial paralysis, high blood pressure, loss of hearing, partial loss of vision in right eye, tear duct deficiency in right eye, excessive tiredness, weakness, muscle and joint pain, high blood pressure, loss of balance, dizziness, numbness, loss of smell and taste, and impairment of sexual functioning and reproductive deficiencies, all of which compelled Plaintiff, ROBERT R. REIMERTZ, JR., to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

44

167.    In other words, upon information and belief, Plaintiff, ROBERT R. REIMERTZ, JR.'s aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, ROBERT R. REIMERTZ, JR., was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, ROBERT R. REIMERTZ, JR., was engaged in the performance of his assigned duties as a police officer or during any acts which were reasonably necessary or incidental to his employment.

168.    Plaintiff,  ROBERT R. REIMERTZ, JR., became aware of the proximate cause of his injuries on or about September 25, 2004, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

169.    Plaintiff,  ROBERT R. REIMERTZ, JR., as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

170.    Plaintiff, ROBERT R. REIMERTZ, JR.,  pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on December 22, 2004, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A FIFTH CLAIM
## NEGLIGENCE (WITH RESPECT TO HAROLD FRAY)

171.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "170" herein, as if each has been fully set forth at length.

45

172.     Plaintiff, HAROLD FRAY, in his capacity as a Police Officer of the NYPD and an employee of the CITY OF NEW YORK, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately October, 1984 to May, 2000 and thereafter.

173.     Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the CITY OF NEW YORK, and its agents, Plaintiff, HAROLD FRAY, suffered multiple and serious injuries and pain and suffering, including but not limited to, a brain tumor, which required brain surgery and removal of part of his skull and part of his axis and atlas, and resulted in pain, discomfort, emotional distress, headaches, hearing loss, coordination difficulties, walking difficulties, numbness in left arm, and pain in back of head running from back of head to neck and shoulders, all of which compelled Plaintiff, HAROLD FRAY, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

174.     In other words, upon information and belief, Plaintiff, HAROLD FRAY's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, HAROLD FRAY, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, HAROLD FRAY, was engaged in the performance of his assigned duties as a police officer or during any acts which were reasonably necessary or incidental to his employment.

175.     Plaintiff, HAROLD FRAY, became aware of the proximate cause of his injuries on or about September 25, 2004, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

176.    Plaintiff, HAROLD FRAY, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction.

177.    Plaintiff, HAROLD FRAY, pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on December 22, 2004, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A SIXTH CLAIM
## NEGLIGENCE (WITH RESPECT TO DESIREE LYONS)

178.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "177" herein, as if each has been fully set forth at length.

179.    Plaintiff, DESIREE LYONS, in her capacity as a Police Officer of the NYPD and an employee of the City of New York, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while her place of employment was 151 W. 100th Street, New York, New York, from approximately October, 1996 to November, 2002 and thereafter.

180.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the City of New York, and its agents, Plaintiff, DESIREE LYONS, suffered multiple and serious injuries and pain and suffering, including but not limited to, lead poisoning, lethargy, facial paralysis, memory loss, extreme irritability, joint tenderness and pain, general body aches, sleep impairment, headaches, dizziness, loss of balance, numbness, impairment of speech, inability to concentrate, diminishment of vision, chronic

47

fatigue, nausea/vomiting, constipation, chest pains, impairment of sexual functioning and other neurological disorders, all of which compelled Plaintiff, DESIREE LYONS, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of her life.

181.   In other words, upon information and belief, Plaintiff, DESIREE LYONS', aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to her aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, DESIREE LYONS, was acting in the course and scope of her employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, DESIREE LYONS, was engaged in the performance of her assigned duties as a police officer or during any acts which were reasonably necessary or incidental to her employment.

182.   Plaintiff, DESIREE LYONS, became aware of the proximate cause of her injuries on or about September 25, 2004, after receipt and review of  the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries she has suffered.

183.   Plaintiff, DESIREE LYONS, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

184.    Plaintiff, DESIREE LYONS,  pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on December 22, 2004, which was within ninety (90) days after her claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A SEVENTH CLAIM
## NEGLIGENCE (WITH RESPECT TO JOSEPH CAIVANO)

185.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "184" herein, as if each has been fully set forth at length.

186.    Plaintiff, JOSEPH CAIVANO, in his capacity as a Police Officer of the NYPD and an employee of the City of New York, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately February, 1994 to present.

187.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the City of New York, and its agents, Plaintiff, JOSEPH CAIVANO, suffered multiple and serious injuries and pain and suffering, including but not limited to, asthma, memory loss, nerve damage, facial numbness, cognitive impairment, gastro-intestinal disorders, extreme fatigue, and impairment of dexterity, which resulted in pain, discomfort and emotional distress, all of which compelled Plaintiff, JOSEPH CAIVANO, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

188.    In other words, upon information and belief, Plaintiff, JOSEPH CAIVANO's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, JOSEPH CAIVANO, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, JOSEPH CAIVANO, was engaged in the performance of his assigned duties as a police officer or during any acts which were reasonably necessary or incidental to his employment.

189.   Plaintiff, JOSEPH CAIVANO, became aware of the proximate cause of his injuries on or about January 19, 2005, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

190.   Plaintiff, JOSEPH CAIVANO, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction.

191.    Plaintiff, JOSEPH CAIVANO,  pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on January 20, 2005, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A EIGHTH CLAIM
## NEGLIGENCE (WITH RESPECT TO VINCENT BALSAMO)

192.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "191" herein, as if each has been fully set forth at length.

193.   Plaintiff, VINCENT BALSAMO, in his capacity as a Police Officer of the NYPD and an employee of the City of New York, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately April, 1998 to present.

194.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the City of New York, and its agents, Plaintiff, VINCENT BALSAMO, suffered multiple and serious injuries and pain and suffering, including but not limited to, asthma, high blood pressure, sleep impairment, nerve damage, and loss of taste, which resulted in pain, discomfort and emotional distress,  all of which compelled Plaintiff, VINCENT BALSAMO, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

195.    In other words, upon information and belief, Plaintiff, VINCENT BALSAMO's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, VINCENT BALSAMO, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, VINCENT BALSAMO, was engaged in the performance of his assigned duties as a police officer or during any acts which were reasonably necessary or incidental to his employment.

196.    Plaintiff, VINCENT BALSAMO, became aware of the proximate cause of his injuries on or about January 19, 2005, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

197.    Plaintiff, VINCENT BALSAMO, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

198.    Plaintiff, VINCENT BALSAMO,  pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on January 20, 2005, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant,

CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A NINTH CLAIM
## NEGLIGENCE (WITH RESPECT TO FERNANDO CAMACHO)

199.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "198" herein, as if each has been fully set forth at length.

200.    Plaintiff, FERNANDO CAMACHO, in his capacity as a Firefighter of the FDNY and an employee of the City of New York, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately February 16, 1999 to October, 2003.

201.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the City of New York, and its agents, Plaintiff, FERNANDO CAMACHO, suffered multiple and serious injuries and pain and suffering, including but not limited to, nerve damage, Bell's Palsy, paralysis of the face, vision impairment, sleep impairment, blurred vision and facial disfigurement, loss of taste, tongue numbness, and excessive facial swelling, which resulted in pain, discomfort and emotional distress,  all of which compelled Plaintiff, FERNANDO CAMACHO, to undergo significant medical care and treatment and has resulted in a substantial diminishment in the quality of his life.

202.    In other words, upon information and belief, Plaintiff, FERNANDO CAMACHO's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, FERNANDO CAMACHO, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, FERNANDO CAMACHO, was

52

engaged in the performance of his assigned duties as a firefighter or during any acts which were reasonably necessary or incidental to his employment.

203.   Plaintiff, FERNANDO CAMACHO, became aware of the proximate cause of his injuries on or about January 19, 2005, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

204.   Plaintiff, FERNANDO CAMACHO, as a result of Defendant, CITY OF NEW YORK's, aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

205.   Plaintiff, FERNANDO CAMACHO,  pursuant to and in compliance with **New York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on January 20, 2005, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

## AS AND FOR A TENTH CLAIM
## NEGLIGENCE (WITH RESPECT TO GEORGE RODRIGUEZ)

206.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "205" herein, as if each has been fully set forth at length.

207.   Plaintiff, GEORGE RODRIGUEZ, in his capacity as a Firefighter of the FDNY and an employee of the City of New York, was exposed to extremely high levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, while his place of employment was 151 W. 100th Street, New York, New York, from approximately October, 1996 to September, 2004.

53

208.    Upon information and belief, as a direct and proximate result of the aforesaid acts, omissions, inactions and/or breaches of duty of the City of New York, and its agents, Plaintiff, GEORGE RODRIGUEZ, suffered multiple and serious injuries and pain and suffering, including but not limited to, nerve damage, Bell's Palsy, paralysis of the face, vision impairment, sleep impairment, blurred vision and facial disfigurement, loss of taste, tongue numbness and excessive facial swelling, numbness in arm, irritability,  which resulted in pain, discomfort and emotional distress,  all of which compelled Plaintiff, GEORGE RODRIGUEZ, to undergo significant medical case and treatment, and has resulted in a substantial diminishment in the quality of his life.

209.    In other words, upon information and belief, Plaintiff, GEORGE RODRIGUEZ's, aforesaid exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances, caused or substantially contributed to his aforesaid injuries.  Said injuries, moreover, are not injuries incurred while Plaintiff, GEORGE RODRIGUEZ, was acting in the course and scope of his employment by Defendant, CITY OF NEW YORK, in that said injuries, upon information and belief, were not incurred while Plaintiff, GEORGE RODRIGUEZ, was engaged in the performance of his assigned duties as a firefighter or during any acts which were reasonably necessary or incidental to his employment.

210.    Plaintiff, GEORGE RODRIGUEZ, became aware of the probable cause of his injuries on or about February 7, 2005, after receipt and review of the aforesaid toxicology report from Forensic Associates, which connected exposure to high lead levels at the 24th Precinct stationhouse to the aforesaid medical problems and injuries he has suffered.

211.    Plaintiff, GEORGE RODRIGUEZ, as a result of Defendant, CITY OF NEW YORK's aforesaid acts of negligence, has suffered damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction.

212.    Plaintiff, GEORGE RODRIGUEZ,  pursuant to and in compliance with **New**

**York General Municipal Law §§ 50-e and 50-i**, served a Notice of Claim on Defendant, CITY OF NEW YORK, on February 9, 2005, which was within ninety (90) days after his claim arose; and more than thirty (30) days have elapsed since the service of such notice; and Defendant, CITY OF NEW YORK, has failed and refused to make any adjustment or payment thereof with respect to said notice.

<u>AS AND FOR AN ELEVENTH CLAIM</u>
<u>SPOLIATION OF EVIDENCE WHICH HAS IMPAIRED AND CONTINUES</u>
<u>TO IMPAIR PLAINTIFFS' RIGHTS TO SUE THIRD-PARTY TORTFEASORS</u>

213.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "212" herein, as if each has been fully set forth at length.

214.    As stated above, Defendant, CITY OF NEW YORK, had actual or constructive knowledge that the ventilation system for the firing range in the basement of the 24th Precinct had "design flaws" and/or had been inadequately installed and/or deficiently maintained for a number of years.  (***COSH/DOH 1992 Report*** (Ex. A) at pp. iii, 11-13, 31, 34 & 39).

215.    Said ventilation system deficiencies were so serious as to prevent the City of New York, and its agents, from being able to control the lead hazard at the subject premises below the applicable OSHA action level. (***COSH/DOH 1992 Report*** (Ex. A) at p. 12).

216.    At all material times, the ventilation system at the firing range was "used to control exposure" to toxic substances.  (***COSH/DOH 1992 Report*** (Ex. A) at pp. 11 & 34).

217.    As such, pursuant to **29 CFR 1910.1025(e)(4)(i)**, Defendant, CITY OF NEW YORK, was statutorily duty-bound to take measurements which demonstrated the effectiveness of said ventilation system at least once every three (3) months and checked within five (5) days of any process, production or control changes.  (***COSH/DOH 1992 Report*** (Ex. A) at p. 34).

218.   Said measurements required by **29 CFR 1910.1025(e)(4)(i)** constitute "employee exposure records" as defined in **29 CFR 1910.1020(c)(5)**.

219.   Pursuant to **29 CFR 1910.1020(d)(1)**, Defendant, CITY OF NEW YORK, was and is statutorily duty-bound to take, preserve and maintain said measurements/employee exposure records for at least thirty (30) years.

220.   In response to Request No. 1 of Plaintiffs' aforesaid Document Demand (Ex. P), Defendant, CITY OF NEW YORK, failed to produce <u>any</u> documents, records or reports which relate to the design and/or installation of the 24th Precinct's firing range ventilation system.

221.   In response to Request No. 2 of Plaintiffs' aforesaid Document Demand (Ex. P), Defendant, CITY OF NEW YORK, failed to produce <u>any</u> documents which relate to any repairs and/or maintenance of the 24th Precinct's ventilation system, other than a few documents related to a ventilation system modification apparently completed by B.P. & J. Associates, Inc., in or about April, 1996.

222.   Most compellingly, in response to Request No. 3 of Plaintiffs' aforesaid Document Demand (Ex. P), which requested, **inter alia**, all tests and/or measurements of airborne lead levels and/or exposures, and/or the effectiveness of any firing range ventilation system at the NYPD's 24th Precinct Station House, from 1989 to present, the CITY OF NEW YORK produced <u>no</u> documents, other than certain documents which relate to limited air monitoring and a ventilation survey, performed on April 10, 1996, to, **inter alia**, "determine airborne lead concentrations during test firing".  (Exhibits G and H hereto).

223.   Defendant, CITY OF NEW YORK, moreover, has asserted through its agent, Christopher J. Murdoch, that no other documents responsive to Plaintiffs' Document Demand have been preserved or maintained.  (Ex. S).

224.   Defendant, CITY OF NEW YORK's, failure to take, preserve and/or maintain the required "measurements/employee exposure records", as specifically mandated by **29 CFR 1910.1020(d)**, substantially impairs Plaintiffs' ability to pursue its viable claims against certain third-parties who were responsible for the design, installation and/or maintenance of the subject ventilation system.

225.   Defendant, CITY OF NEW YORK, negligently, recklessly or intentionally failed to take, preserve and/or maintain said documents and test results and measurements, which it was statutorily duty-bound to preserve and maintain for at least thirty (30) years.

226.   Defendant, CITY OF NEW YORK's, aforesaid acts, omissions and inactions are even more egregious in view of the aforesaid 1992 COSH/DOH Report, in which COSH and the DOH specifically pinpointed Defendant, CITY OF NEW YORK's, obligations pursuant to **29 CFR 1910.1025(e)(4)(i)**.  (***COSH/DOH 1992 Report*** (Ex. A) at p. 34).

227.   Indeed, pursuant to said 1992 COSH/DOH Report, Defendant, CITY OF NEW YORK, had actual or constructive notice that there was a high risk of employee exposure to lead and other toxic substances at the 24th Precinct.

228.   As such, as of January, 1992, Defendant, CITY OF NEW YORK, had actual or constructive knowledge of potential lawsuits against it as a result of said undue employee exposure at the subject premises, and thus had a heightened obligation to take, preserve and maintain the required air quality tests, measurements and tests and measurements demonstrating the effectiveness of the subject ventilation system, and employee exposure records.

229.   Due exclusively to Defendant, CITY OF NEW YORK's, negligent, reckless and/or intentional spoliation of evidence, Plaintiffs are foreclosed from establishing any viable causes of action against those third party tortfeasors who failed to properly design, install and/or maintain the subject ventilation system at all material times.

230.   Given Defendant, CITY OF NEW YORK's, own 1992 COSH/DOH Report and other documents and reports cited herein, it is incontrovertible that certain third parties did act negligently toward Plaintiffs, and other employees of the CITY OF NEW YORK, by failing to adequately and reasonably design, install and/or maintain the subject ventilation system.

231.   For the reasons stated hereinabove, Defendant, CITY OF NEW YORK, has negligently, recklessly or intentionally destroyed or lost critical proof with respect to the design, installation and/or maintenance of the 24th Precinct's firing range ventilation system, such that Plaintiffs are prejudicially bereft of appropriate means to present their claims against certain third-party tortfeasors with incisive evidence.

232.   As a direct and proximate result of Defendant, CITY OF NEW YORK's, aforesaid impairment of Plaintiffs' rights to sue certain third-party tortfeasors, Defendant, CITY OF NEW YORK, is obligated to indemnify each of the Plaintiffs for all damages he or she has incurred as a result of the negligence of said third-party tortfeasors.

**AS AND FOR A TWELFTH CLAIM**
**FRAUDULENT CONCEALMENT**

233.   Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "232" herein, as if each has been fully set forth at length.

234.   Defendant, CITY OF NEW YORK, and its agents, by virtue of its receipt of the 1992 COSH/DOH Report, other documents and reports as described hereinabove, and otherwise, at all material times, had superior knowledge to that of each of the Plaintiffs herein with respect to its employees' excessive risk of exposure to lead, lead dust and/or fumes, and/or other toxic on dangerous substances, at the subject premises, as well as the ventilation system design, installation, maintenance and functioning deficiencies at the subject premises.

58

235.     Defendant, CITY OF NEW YORK, and its agents, had a "special relationship" with each of the Plaintiffs herein, in that each of the Plaintiffs regularly and routinely performed duties, as either a police officer or firefighter, with a significant risk of inherent danger; and that each of the Plaintiffs was a "first responder" who voluntarily and routinely subjects and/or subjected himself or herself to dangerous and/or hazardous situations in order to protect and serve all citizens of Defendant, CITY OF NEW YORK.

236.     Defendant, CITY OF NEW YORK, by reason of its said superior knowledge and "special relationship" with each Plaintiff, had a duty to warn and notify its employees, including each of the Plaintiffs herein, of their excessive risk of exposure to lead, lead dust and/or fumes, and/or other toxic or dangerous substances at the subject premise, as well as the aforesaid ventilation deficiencies at the subject premises.

237.     Said "duty to warn and notify" was, at all material times, also mandated by **New York Labor Law § 27-a(9)(c)**, which provides in pertinent part that "[e]ach employer shall promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by any safety and health standard promulgated under this section, and shall inform any employee who is being exposed of the corrective ation being taken and the time limit for correction."

238.     Defendant, CITY OF NEW YORK, and its agents, at all material times, deliberately, intentionally, willfully and wantonly concealed from its employees, including each of the Plaintiffs herein, all facts and information related to its employees' excessive risk of exposure to lead, lead dust and/or fumes, and/or either toxic or dangerous substances, at the subject premises, as well as all facts and information related to the ventilation system design, installation, maintenance and functioning deficiencies at the subject premises.

239.     Each of the Plaintiffs herein relied, to his or her considerable detriment and prejudice, on Defendant, CITY OF NEW YORK, to provide him or her with a safe and healthy

59

place of employment which was free from excessive levels of toxic and/or dangerous substances and likewise free from a malfunctioning and/or deficient ventilation system, and to notify him or her of any known environmental risks or dangers at the subject premises.

240.    As a direct and proximate result of the aforesaid wrongful and fraudulent concealments on the part of Defendant, CITY OF NEW YORK, and the aforesaid reliance of each of the Plaintiffs herein, each of the Plaintiffs incurred injuries as described hereinabove.

<u>**AS AND FOR A THIRTEENTH CLAIM**</u>
<u>**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**</u>

241.    Plaintiffs hereby repeat and reallege paragraphs "1" through "240", as if each has been fully set forth at length.

242.    By reason of the foregoing, Defendant, CITY OF NEW YORK, engaged in conduct with respect to, **inter alia**, the furnishing of police and fire services in the State of New York, that was deceptive and misleading in a material way.

243.    Said deceptive and misleading conduct was "consumer-oriented" and caused consumer injury and/or harm to the public interest in that Defendant, CITY OF NEW YORK:

(A)    Exposed its employees, including each of the Plaintiffs herein, to excessive and dangerous levels of leads, lead dusts and/or fumes, and/or toxic or dangerous substances, and thereby caused certain employees, including Plaintiffs, to suffer physical injuries;

(B)    Decreased the health and efficiency within the New York City Police Department and Fire Department of the City of New York, which, upon information and belief, resulted in an increase in taxpayer-funded sick pay and disability pay to employees, and a

decrease in the efficiency of police and fire services within the City of New York, to the detriment of all of the citizens of the City of New York; and

(C)    Exposed various third parties who were from time-to-time present at the subject premises, including guests, invitees, incarcerated individuals, witnesses and victims of crime, to excessive and dangerous levels of lead, lead dust and/or fumes, and/or other toxic or dangerous substances, and thereby, upon information and belief, caused certain of those individuals to suffer physical injuries.

244.    Each of the Plaintiffs has been injured "by reason of" the aforesaid conduct of Defendant, CITY OF NEW YORK.

**ADDITIONAL ALLEGATIONS PERTAINING TO TIMELINESS OF PLAINTIFFS' CLAIMS**

245.    With respect to Plaintiffs' first and second claims, which allege violations of **42 U.S.C. § 1983**, federal law governs the statute of limitations accrual date.   Each of Plaintiffs' claims against Defendant, CITY OF NEW YORK, did not accrue upon the occurrence of any acts or inactions of Defendant, CITY OF NEW YORK, from the 1960s until 2004.  Rather, each of Plaintiffs' federal claims accrued only some time after May 17, 2005, when - after Plaintiffs reviewed the documents provided by CITY OF NEW YORK in response to Plaintiffs' aforesaid pre-action disclosure petition - it became clear to each Plaintiff that Defendant, CITY OF NEW YORK, deprived him or her of the aforesaid federally protected rights pursuant to the aforesaid municipal practices, policies or customs of Defendant, CITY OF NEW YORK.  For this reason alone, Plaintiffs' federal claims are timely.

246.    Each of the pendent state claims of  Plaintiffs in this action is also timely, pursuant to **42 U.S.C. § 9658 (1994)**, a provision of the **Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")**, and otherwise.  Under this

provision, the running of the state statute of limitations for applicable actions is delayed until "the date the plaintiff knew (or reasonably should have known) that the personal injury . . . [was] caused or contributed to by the hazardous substance or pollutant or contaminant concerned." **42 U.S.C. § 9658(b)(4)(A)**.  Such date is, as stated hereinabove, on or after September 25, 2004 for each Plaintiff.

247.    The building or "subject premises" located at 151 W. 100th Street, New York, New York, is, and at all material times has been, a "facility" as defined in **42 U.S.C. § 9601(9)(A)**.

248.    Each of the aforesaid injuries incurred by Plaintiffs occurred as a result of a substance, such as lead, lead dust and/or fumes, and/or other toxic or dangerous substances, being "released into the environment from a facility", pursuant to **42 U.S.C. § 9658(a)(2)**.

249.    **42 U.S.C. § 9601(22)** broadly defines "release" in pertinent part as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging or disposing into the environment".

250.    At all material times, Defendant, CITY OF  NEW YORK, released substances, such as lead, lead dust and/or fumes, and/or other toxic or dangerous substances, into the environment by, **inter alia**, creating and failing to remediate dangerous conditions whereby Plaintiff, and other employees of Defendant, CITY OF NEW YORK, carried said hazardous substances out of the workplace on their clothing,  person, hair and skin.

251.    Defendant, CITY OF NEW YORK, moreover, at all material times, knowingly, recklessly and wantonly failed and refused to provide each of the Plaintiffs herein with the facts and information necessary for him or her to ascertain the source or sources of his or her respective injuries.

252.    Accordingly, Defendant, CITY OF NEW YORK, should be estopped from pleading or asserting any Statute of Limitations defense with respect to each of Plaintiffs' claims.

**WHEREFORE,** based upon the aforesaid, Plaintiffs respectfully request that this Court issue an Order and Judgment in favor of Plaintiffs and against Defendant, CITY OF NEW YORK, which shall provide:

1.    As and for the first claim (deprivation of Plaintiffs' substantive due process rights to be free from conduct by governmental employer that "shocks the conscience" in violation of **42 U.S.C. § 1983**), that Defendant, CITY OF NEW YORK, pay each of the Plaintiffs compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction, and reimburse Plaintiffs for all legal fees incurred in connection with the prosecution of this action, pursuant to **42 U.S.C. § 1988**;

2.    As and for a second cause of action (deprivation of Plaintiffs' constitutional rights of full access to courts and property interest in full value of lawsuit, in violation of **42 U.S.C. § 1983**), that Defendant, CITY OF NEW YORK, pay each of the Plaintiffs compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction, reimburse Plaintiffs for all legal fees incurred in connection with the prosecution of this action, pursuant to **42 U.S.C. § 1988**, and indemnify each of the Plaintiffs for all damages he or she has incurred pursuant to each of the claims pleaded within this Complaint;

3.    As and for the third claim (negligence with respect to ROCCO FARELLA), that Defendant, CITY OF NEW YORK, pay Plaintiff, ROCCO FARELLA, compensatory damages in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction;

4.    As and for the fourth claim (negligence with respect to ROBERT R. REIMERTZ, JR.), that Defendant, CITY OF NEW YORK,  pay Plaintiff, ROBERT R.

REIMERTZ, JR., compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

5.    As and for the fifth claim (negligence with respect to HAROLD FRAY), that Defendant, CITY OF NEW YORK, pay Plaintiff, HAROLD FRAY, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

6.    As and for the sixth claim (negligence with respect to DESIREE LYONS), that Defendant, CITY OF NEW YORK, pay Plaintiff, DESIREE LYONS, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

7.    As and for the seventh claim (negligence with respect to JOSEPH CAIVANO), that Defendant, CITY OF NEW YORK, pay Plaintiff, JOSEPH CAIVANO, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

8.    As and for the eighth claim (negligence with respect to VINCENT BALSAMO), that Defendant, CITY OF NEW YORK, pay Plaintiff, VINCENT BALSAMO, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

9.    As and for the ninth claim (negligence with respect to FERNANDO CAMACHO), that Defendant, CITY OF NEW YORK, pay Plaintiff, FERNANDO CAMACHO, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

10.   As and for the tenth claim (negligence with respect to GEORGE RODRIGUEZ), that Defendant, CITY OF NEW YORK, pay Plaintiff, GEORGE RODRIGUEZ, compensatory damages in a sum to be determined which exceeds the jurisdiction of lower courts which would otherwise have jurisdiction;

11.   As and for the eleventh claim (spoliation of evidence which impaired and continues to impair Plaintiffs' rights to sue third-party tortfeasors), that Defendant, CITY OF NEW YORK, be compelled to indemnify each of the

64

Plaintiffs for all damages caused to each of the Plaintiffs as a result of the negligence of certain third-party tortfeasors against whom Plaintiffs are prejudicially bereft of appropriate means to present their claims with incisive evidence, due exclusively to Defendant, CITY OF NEW YORK's, negligent, reckless or intentional spoliation of critical evidence;

12. As and for the twelfth claim (fraudulent concealment), that Defendant, CITY OF NEW YORK,  pay each of the Plaintiffs compensatory damages for said fraudulent concealment in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction;

13. As and for the thirteenth claim (violation of **New York General Business Law § 349**), that Defendant, CITY OF NEW YORK, pay each of the Plaintiffs herein, his or her actual damages incurred by reason of Defendant, CITY OF NEW YORK's, violation of **New York General Business Law § 349**, in a sum to be determined which exceeds the jurisdiction of  lower courts which would otherwise have jurisdiction, as well as reasonable attorneys' fees, pursuant to **New York General Business Law § 349 (h)**;

14. That this Court shall award Plaintiffs reasonable attorneys' fees and the costs and disbursements of this action; and

15. Grant Plaintiffs any other, different or further relief as to this Court may seem just, proper or necessary.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:          June 20, 2005
                    Orangeburg, New York          Respectfully submitted,

                                            ***KEVIN T. MULHEARN, P.C.***

                                        By: <u>s/_____</u>
                                            ***Kevin T. Mulhearn, Esq.*** (KM 2301)

                                        Attorneys for Plaintiffs

                                        60 Dutch Hill Road
                                        Suite 8
                                        Orangeburg, New York 10962
                                        Phone: 845-398-0361
                                        Fax: 845-398-3836

66